FILED
COURT OF APPEALS
DIVISION II

2013 OCT 22 AM 8: 55

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| RITH KOK, individually and as administrator of the Estate of SAMNANG KOK, deceased; MAKAI JOHNSON-KOK, individually and as a beneficiary of the Estate of SAMNANG KOK; RORTH KOK, individually and as a beneficiary of the Estate of SAMNANG KOK; RY SOU KOK, individually and as a beneficiary of the Estate of SAMNANG KOK; KOSAL KOK, individually and as a beneficiary of the Estate of SAMNANG KOK; and LISA KOK, individually and as a beneficiary of the Estate of SAMNANG KOK; <br><br> Appellants, <br><br> v. <br><br> TACOMA SCHOOL DISTRICT NO. 10, A MUNICIPAL ENTITY UNDER THE LAWS OF THE State of Washington; and DOUGLAS SENGSABONG CHANTHABOULY and "JANE DOE" CHANTHABOULY, individually and the marital community composed thereof; <br><br> Respondents. | No. 44517-4-II <br><br><br><br><br><br><br> UNPUBLISHED OPINION |

PENOYAR, J. — The estate of Samnang Kok (Estate) sued the Tacoma School District (District) for negligence after Douglas Chanthabouly shot Kok in the hallway at Foss High School. To prevail in its negligence action, the Estate had the burden to show that the District had some reason to believe Chanthabouly might be dangerous. The trial court granted summary judgment for the District, finding that Chanthabouly's actions were not foreseeable. The Estate appeals, arguing that foreseeability is an issue for the jury and that the trial judge, whose spouse had previously represented the District on unrelated issues, should have recused herself under the appearance of fairness doctrine. Because Chanthabouly's behavior and medical records did not

indicate that he was at risk for harming other students, we hold that the trial court did not err in finding that his actions were not foreseeable by the District. Additionally, the trial judge did not err by denying the Estate's recusal motion because neither she nor her spouse has an interest in the outcome of the present case. We affirm.

## FACTS

On January 3, 2007, Chanthabouly fatally shot Kok in the hallway at Foss High School. The Estate brought this claim against the District, arguing that it was negligent by failing to maintain a safe school environment and by enrolling a student with a severe mental illness.

### I. MEDICAL HISTORY

Chanthabouly was diagnosed with paranoid schizophrenia following a suicide attempt in January 2005. At the time of his suicide attempt, doctors noted that he was hearing voices, that he claimed to get into fights with people he did not know, and that his thoughts were illogical and his judgment bad. After a brief hospitalization, Chanthabouly received 11 months of outpatient mental health care from Comprehensive Mental Health.[1] His psychiatrists prescribed him antipsychotics, which he took in the morning and at night, to combat his auditory hallucinations. When Chanthabouly's care at Comprehensive Mental Health ended in January 2006, his case manager stated that he was stable while on his medication; he occasionally heard voices, but they did not tell him to harm himself and he was able to separate reality from hallucinations.

Chanthabouly's medical records do not indicate that he was at risk for assaultive behavior. His mental health assessment, completed while he was receiving treatment following his suicide attempt, states that he "has never been assaultive towards others." Clerk's Papers

---

[1] Foss requested Chanthabouly's records from the hospital and Comprehensive Mental Health.

2

(CP) at 114. His mental health counselor noted that while he continued to have post-treatment auditory hallucinations, they were not usually commanding or threatening. His psychiatrist testified that she did not see any indication that he would harm others. His medical records also contain assessments from Chanthabouly and his mother. Both of them indicated that he was lonely and had difficulty getting along with his peers but that he did not get into fights or arguments.

II.    SCHOOL HISTORY

Chanthabouly attended several high schools within the District. He started the 2002-03 school year at Stadium High School, and then transferred to Foss, where his siblings were enrolled. Chanthabouly began the 2003-04 school year at Mount Tahoma High School because his family had moved into Mount Tahoma's attendance area. He transferred from Mount Tahoma to Oakland High School mid-school year, and remained at Oakland for the rest of the year.[2] Chanthabouly began the 2004-05 school year back at Mount Tahoma, but, after his suicide attempt, he transferred to Foss, where his younger brother was enrolled.[3] He remained at Foss from April 2005 until January 2007.

Chanthabouly's school record does not contain any incidents of prior assaultive behavior. His suspension at Stadium was for "defiance of authority" and not for fighting. CP at 342. He complained of bullying while at Mount Tahoma, but his record does not show any acts on his

---

[2] Chanthabouly's mother told his doctor that she moved him to Oakland after a gang of students hit him in the back of the head. His sister testified that he transferred to Oakland because he was having trouble with his school work.

[3] The transfer request form states, "If any behavior or attendance problems student will return to Mt Tahoma." CP at 353. The Estate points to this as evidence of Chanthabouly's behavior problems. But the note does not say that Chanthabouly's problems involved fighting or violent acts, and, since Chanthabouly was not transferred back to Mount Tahoma, it appears that he did not have any behavior problems while attending Foss.

part. Additionally, none of the staff noticed any violent behavior while Chanthabouly was at Foss. His principal testified that Chanthabouly was never referred to him for disciplinary issues. Similarly, his counselor stated that teachers would approach him if they were concerned about a student and that no teachers approached him about Chanthabouly. Chanthabouly's teachers reported that, although he had difficulty participating in class and finishing his assignments, he was cooperative and polite. The school security officer testified that he did not have any concerns about Chanthabouly prior to January 2007 and that, while he noticed Chanthabouly talking and laughing to himself, he never witnessed Chanthabouly getting in fights with other students or being bullied.

In 2005, Chanthabouly's mother requested that Foss test him for special education eligibility because he was struggling academically. Foss determined that Chanthabouly was "Emotionally/Behaviorally Disabled" and qualified for special education services to improve his classroom participation and written language skills. CP at 93. As a result, he attended a daily, one hour written language class with a special education instructor. He wrote the following paragraph as a writing assignment for that class: "I nevered [sic] try dirt. I know a sludge face named Sam. He loves dirt. He eats dirt and he's going to live in dirt. He says he's going to live there forever. I think sludge faces are weird." CP at 215. His teacher wrote, "Good! Interesting." at the top of the page. CP at 215. She testified that she did not know who Sam was and that there was nothing about the assignment that alarmed her.

III.  PROCEDURE

The Estate filed a complaint against the District, alleging that it "was negligent by failing to use reasonable care in maintaining a safe school environment" and by "enrolling an individual whom they knew or should have known had substantial mental illness and as a result, extremely dangerous propensities."[4] CP at 8.

The District moved for summary judgment, arguing that Chanthabouly's actions were not foreseeable. The trial court granted the District's summary judgment motion and dismissed the Estate's claims. The Estate filed a motion for reconsideration, arguing that there were material facts at issue regarding foreseeability. While that motion was pending, the Estate's attorneys discovered that the trial judge's spouse and his firm had represented the District in unrelated matters. The Estate filed a motion for recusal. The trial court denied the Estate's motions for recusal and reconsideration. The Estate appealed both denials directly to the Supreme Court. That court denied direct review and transferred the case to this court.

ANALYSIS

I.  SUMMARY JUDGMENT

We review an order granting or denying summary judgment de novo and perform the same inquiry as the trial court. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006). "A motion for summary judgment is properly granted where 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Michak v. Transnation Title Ins. Co.*, 148 Wn.2d 788, 794-95, 64 P.3d 22 (2003) (quoting CR 56(c)). We view the facts and any reasonable inferences in the light most favorable to the nonmoving party. *Michak*, 148 Wn.2d at 794.

---

[4] The other parties and claims were dismissed during the course of the suit.

II.     FORESEEABILITY

The Estate argues that the trial court erred by granting the District's summary judgment motion because forseeability is generally a question for the jury.[5] Because reasonable minds would not differ in concluding that Chanthabouly's acts were not foreseeable by the District, we affirm the trial court.

A school district is required to exercise reasonable care—that of a reasonably prudent person under similar circumstances—when supervising students within its custody. *J.N. v. Bellingham Sch. Dist. No. 501*, 74 Wn. App. 49, 57, 871 P.2d 1106 (1994). "[A] school district has the power to control the conduct of its students while they are in school or engaged in school activities, and with that power goes the responsibility of reasonable supervision." *Peck v. Siau*, 65 Wn. App. 285, 292, 827 P.2d 1108 (1992).

But the duty to exercise reasonable care extends only to risks of harm that are foreseeable. *J.N.*, 74 Wn. App. at 57. A risk of harm is foreseeable if it is within the "general field of danger covered by the specific duty owed by the defendant." *J.N.*, 74 Wn. App. at 57 (quoting *Maltman v. Sauer*, 84 Wn.2d 975, 981, 530 P.2d 254 (1975)). Intentional or criminal conduct may be foreseeable unless it is "so highly extraordinary or improbable as to be wholly beyond the range of expectability." *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 50, 929 P.2d 420 (1997) (quoting *Johnson v. State*, 77 Wn. App. 934, 942, 894 P.2d 1366 (1995)). Foreseeability is normally a jury question, but it may be decided as a matter of law where reasonable minds cannot differ. *J.N.*, 74 Wn. App. at 57.

---

[5] The Estate also argues that the trial court misinterpreted the scope of the District's duty. But it does not define the scope used by the trial court or argue why the scope was incorrect. Rather, the Estate's argument in this section appears to be that it produced evidence sufficient to show that the District should have known that Chanthabouly was dangerous. That argument is addressed in this section.

Division One of this court held that summary judgment was inappropriate where the plaintiff had established that the harm was within the general field of danger and the defendant school district could reasonably have anticipated the offending student's actions. *J.N.*, 74 Wn. App. at 62. In *J.N.*, a student was sexually assaulted by another student in the bathroom during recess. 74 Wn. App. at 51. The court held that the general field of danger—harm by one student to another in accessible and unsupervised restrooms—was reasonably foreseeable by the district. *J.N.*, 74 Wn. App. at 59-60. Additionally, there was evidence that the district knew of the assaulting student's dangerous propensities. *J.N.*, 74 Wn. App. at 60. The district knew that the student had significant behavioral problems, including physically assaulting other students; had a possible family history of sexual abuse; used inappropriately sexual language; and was determined to be "severely behaviorally disabled" by the school psychologist. *J.N.*, 74 Wn. App. at 52-53.

By contrast, we have held that summary judgment is appropriate where there is no reason to believe that a school district should have known of a risk to students. *Peck*, 65 Wn. App. at 287, 293. In *Peck*, a librarian sexually assaulted a student. 65 Wn. App. at 287. We held that there was nothing in the record to indicate that the district knew the librarian was a threat to students. *Peck*, 65 Wn. App. at 293. We noted that a school district is required to protect students from third parties' harmful actions, but it is not liable merely because such actions occur. *Peck*, 65 Wn. App. at 293. Instead, the harmful activities must be foreseeable. *Peck*, 65 Wn. App. at 293.

Here, the Estate has failed to show that the harm caused by Chanthabouly was foreseeable. It appears to argue that the general field of danger was allowing a schizophrenic student in the general education population. The Estate contends that Chanthabouly's behavior at school and his schizophrenia diagnosis presented evidence from which the District should have reasonably anticipated that he would engage in a violent act on school grounds. Neither Chanthabouly's behavior at school nor his medical records indicated any assaultive behavior or tendencies. Moreover, the District did not have any information that Chanthabouly's diagnosis alone was an indication that he would be a danger to others if placed in the general education population.

Unlike the student in *J.N.*, Chanthabouly's behavior at school did not put the District on notice that he would act violently toward another student.[6] The Estate lists many facts which, it argues, show Chanthabouly's "Violent Propensities." Appellant's Br. at 14. They point to Chanthabouly's 2002 suspension for defiance of authority, his being attacked by a group of students at Mount Tahoma, his frequent school transfers, a line from the school psychologist in his IEP file stating that he gets into fights with people he does not know, reports of him talking and laughing to himself during school hours, a confrontation with a stranger at Sears, and a

---

[6] The Estate repeatedly refers to the lack of school records in this case, apparently based on information it thinks *should* be in the records and a note from a Foss counselor in Chanthabouly's IEP folder stating that his file contains only enrollment paperwork and a few other papers and that she was unable to find his cumulative file at his other schools. However, the record in this case contains his high school grades, enrollment information, and disciplinary actions. Further, there is no evidence that the District purposefully destroyed or withheld any of Chanthabouly's records.

school writing assignment referencing a person named "Sam." None of these facts gave the District notice that Chanthabouly might act violently at school. There was no indication that he might attempt to physically harm someone, let alone with a weapon, and many of these events took place before his diagnosis or while health care providers were still adjusting his treatment.

Moreover, Chanthabouly's schizophrenia diagnosis was not sufficient to place the District on notice that he may act violently. First, the District is not Chanthabouly's medical provider. As the Foss psychologist testified, "In a school setting we deal with the behaviors, not necessarily the diagnosis." CP at 891. Before January 2007, Chanthabouly's behavior was not assaultive, and the District could not reasonably anticipate that he would act violently at school. Second, even his medical providers felt that he was not at risk for harming others. His medical records state that his hallucinations were "not usually command or threatening." CP at 112. Although he had tried to harm himself, before January 2007, Chanthabouly had not tried to harm another person, and his psychiatrist did not believe he was a threat to others.

Further, as the District points out, his diagnosis alone is not a reason to exclude him from a public education. Both federal and state laws require public school districts to provide appropriate education to students with disabilities. *See* Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity");

Rehabilitation Act, 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance"); Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400(d)(1)(A) (one of the purposes of this chapter is "to ensure that all children with disabilities have available to them a free appropriate public education"); RCW 28A.155.010 ("It is the purpose of [this chapter] to ensure that all children with disabilities . . . shall have the opportunity for an appropriate education at public expense as guaranteed to them by the Constitution of this state and applicable federal laws."). To the maximum extent appropriate, the District shall educate children with disabilities in the general education environment.[7] WAC 392-172A-02050(1); WAC 392-172A-03090(1)(d) and (e); 20 U.S.C. § 1412(a)(5)(A). Because the standard of reasonable care is that of a reasonably prudent person *in similar circumstances*, these duties are relevant to whether the District exercised reasonable care.

The Estate argues that Chanthabouly should not have been placed in the general education environment. This contention ignores state and federal antidiscrimination laws and the District's duty to Chanthabouly. The Estate emphasizes the deposition of Dr. Hamm, who opined that Chanthabouly was a "high-risk individual" who should not have been in the general

---

[7] Chanthabouly qualifies as an individual or student with a disability. Under the ADA and the Rehabilitation Act, "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities." 28 C.F.R. § 35.104; 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1). Schizophrenia is a mental impairment that substantially limits brain function. 29 C.F.R. § 1630.2(j)(3)(iii); *Garner v. Chevron Phillips Chem. Co.*, 834 F. Supp. 2d 528, 539 (S.D. Tex. 2011). Under the IDEA, a "child with a disability" includes a child with a serious emotional disturbance who, because of the disability, requires special education and related services. 20 U.S.C. § 1401(3). Under state law, a "student with a disability" means a student who, through an evaluation process, is determined to be eligible for special education due to a disability. RCW 28A.155.020. Foss determined that Chanthabouly was eligible for special education because he was emotionally and behaviorally disabled.

10

education population. CP at 697. But Dr. Hamm stated that he had only general knowledge of a school's legal obligations and that he had not worked within the public school system. Thus, his opinion does not take into account the District's duties to Chanthabouly.

The Estate also relies on literature describing warning signs for violent behavior and argues that Chanthabouly exhibited many of the signs. In doing so, it ignores the cautions in the literature and relies on warning signs that are not supported by the record. The "Early Warning Signs" suggested by the Department of Education caution that "[s]uch signs may or may not indicate a serious problem—they do not necessarily mean that a child is prone to violence toward self or others," and that "it is important to avoid inappropriately labeling or stigmatizing individual students because they appear to fit a specific profile." CP at 655. Further, it warns that "it is inappropriate—and potentially harmful—to use the early warning signs as a checklist against which to match individual children." CP at 657.

Additionally, some of the warning signs that the Estate claims are met are not supported by evidence in the record. The Estate argues that Chanthabouly exhibited the following warning signs: social withdrawal, feelings of isolation, being a victim of violence, little interest in school and poor academic performance, written and verbal expressions of violence, a history of discipline problems, a history of violent and aggressive behavior, and gang affiliations. There is evidence that Chanthabouly was withdrawn and isolated and that he may have been the victim of bullying, but his grades were improving, there are no written or verbal expressions of violence in the record, he had only one disciplinary problem back in 2002 and none of his teachers at Foss noted any disciplinary problems, he did not act violently toward others, and he was not in a gang.

The District did not have evidence through either Chanthabouly's behavior or his diagnosis that he would act violently. Although the Estate argues that his diagnosis alone should

11

have alerted the District to the possibility of violent acts, this argument is not persuasive where the District is staffed by educators, not medical professionals, and where the District owed a duty to Chanthabouly to educate him with his peers. We affirm the trial court.

III. RECUSAL

Finally, the Estate argues that the trial court judge should have recused herself under the appearance of fairness doctrine. Because a reasonably prudent and disinterested person would conclude that all parties received a fair, impartial, and neutral hearing, we affirm the trial judge's decision that recusal was not necessary.

We review a trial judge's decision whether to recuse herself to determine if the decision was manifestly unreasonable or based on untenable reasons or grounds. *State v. Davis*, 175 Wn.2d 287, 305, 290 P.3d 43 (2012); *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). A judicial proceeding satisfies the appearance of fairness doctrine if a reasonably prudent and disinterested person would conclude that all parties obtained a fair, impartial, and neutral hearing. *Tatham v. Rogers*, 170 Wn. App. 76, 96, 283 P.3d 583 (2012). "The test for determining whether the judge's impartiality might reasonably be questioned is an objective test that assumes that 'a reasonable person knows and understands all the relevant facts.'" *Tatham*, 170 Wn. App. at 96 (quoting *Sherman v. State*, 128 Wn.2d 164, 206, 905 P.2d 355 (1995) (quoting *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d cir. 1988)). The asserting party does not have to show actual bias; it is enough to present evidence of potential bias. *Tatham*, 170 Wn. App. at 95. The party must produce sufficient evidence demonstrating actual or potential bias, such as personal or pecuniary interest on the part of the judge; mere speculation is not enough. *In re Pers. Restraint of Haynes*, 100 Wn. App. 366, 377 n.23, 996 P.2d 637 (2000).

44517-4-II

The Estate argues that this case is similar to *Tatham*. In *Tatham*, Division Three of this court held that the trial judge in a property distribution case should have recused himself on appearance of fairness grounds where the judge and one of the attorneys had prior professional and personal connections. 170 Wn. App. at 103, 107. After the judgment, one of the parties discovered that the attorney for the opposing party was a partner in the judge's former firm, may have represented the judge during a DUI arrest, served as the judge's campaign manager, designated the judge her attorney-in-fact, and was appointed county court commissioner by the judge. *Tatham*, 170 Wn. App. at 85. Division Three noted that most of these dealings required disclosure, but not recusal, by the trial judge. *Tatham*, 170 Wn. App. at 103. But, the trial judge's continuing service as the attorney's attorney-in-fact was a violation of the code of judicial conduct (CJC) and presented a reasonable concern about the judge's impartiality. *Tatham*, 170 Wn. App. at 104. Additionally, the court noted that any prejudice was amplified by the discretionary nature of a property distribution proceeding. *Tatham*, 170 Wn.2d at 104-05. The court held that the challenging party demonstrated a violation of the appearance of fairness doctrine and was entitled to a new trial before a different judge. *Tatham*, 170 Wn.2d 107.

Here, a reasonably prudent person would conclude that both parties obtained a fair hearing. Although the trial judge ultimately dismissed the Estate's complaint, she did enter some orders in its favor during the proceedings. For example, she granted the Estate's motions for continuance and to compel Chanthabouly's deposition. Further, the trial judge is not directly connected to the District, and the Estate has not shown that her spouse or his firm has any interest in the outcome of the instant proceeding.

13

Additionally, this case is distinguishable from *Tatham*. First, the connection between the parties and the trial judge is more tenuous in this case. In *Tatham*, the trial judge had direct connections to an attorney appearing before the judge. Here, the Estate does not allege a direct connection between the judge and the parties or their counsel; rather, it alleges that the trial judge's spouse had previously represented the District.

Second, the trial judge in this case did not violate the CJC. In *Tatham*, the trial judge acted as attorney-in-fact for one of the attorneys despite a CJC provision stating, "Judges shall not serve as executors . . . or other fiduciaries, except for the estate, trust or person of members of their families, and then only if such service will not interfere with the proper performance of their judicial duties." Former CJC Canon 5(D) 1995. Here, although the Estate argued below that the trial judge violated CJC 2.11(A)(2)(c) and (3), which require a judge to disqualify herself if she knows that she or her spouse have an interest that could be substantially effected by the proceeding or an economic interest in the subject matter or parties to the proceeding, it did not show that the judge's spouse's interest was more than de minimis.[8] The trial judge's spouse— whose area of concentration is real estate law—and his firm had represented the District only on unrelated issues. Neither the judge's spouse nor his firm has any interest in the outcome of this proceeding—they are not involved in any way in litigating the present case and they will not receive any fees relating to the case.

---

[8] Under CJC 2.11(A)(2)(c), the interest must be more than de minimis, and comment 6 to CJC 2.11 defines "economic interest" as more than a de minimis legal or equitable interest. According to the CJC terminology, "de minimis" means "an insignificant interest that could not raise a reasonable question regarding the judge's impartiality."

14

Finally, the nature of the proceedings was different in each case. In *Tatham*, a property division case, the trial judge had greater discretion in making his decision, and, on review, the appellate court would apply a deferential standard of review. By contrast, this case involved a summary judgment order, which appellate courts review de novo. Therefore, the increased risk of prejudice present in the *Tatham* case is not an issue here.

Neither the trial judge nor her spouse has an interest in the outcome of the present case and a disinterested person would conclude that the parties received a fair and impartial hearing. We hold that the trial judge did not err by denying the Estate's recusal motion.

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Penoyar, J.

We concur:

_____
Johanson, A.C.J.

_____
Bjorgen, J.