# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| TAMMY DIETRICH, individually, and as Personal Representative of the Estate of Skyler Velez and on behalf of the Statutory Beneficiaries thereto,<br><br>    Appellant,<br><br>  v.<br><br>BRUCE NEELY, M.D. and "JANE DOE" NEELY, individually and as a marital community; KATHLEEN HILL, MSW and "JOHN DOE" HILL, individually and as a marital community; ADA MICHELE GUERIN, R.N. and "JOHN DOE" GUERIN, individually and as a marital community; CHELSEA BOLEY, R.N. and "JOHN DOE" BOLEY, individually and as a marital community; MAURICE WILKINS and "JANE DOE" WILKINS, individually and as a marital community; MULTICARE HEALTH SYSTEMS, INC. a Washington Corporation d/b/a MultiCare Auburn Medical Center; CASCADE EMERGENCY PHYSICIANS, INC., P.S., a Washington Corporation; "JOHN DOES" 1-10, unknown healthcare providers and their unknown spouses, individually and as a marital community; DOE HEALTHCARE ENTITIES 1-10, unknown health care entities, DOE BUSINESS ENTITIES, 1-10, unknown business entities,<br><br>    Respondents,<br><br>JAMES VENTRESS, R.N. and "JANE DOE" VENTRESS, individually and as a marital community,<br><br>    Defendants. | No. 83152-6-I<br><br>ORDER ON MOTIONS FOR RECONSIDERATION |

The respondents' having filed a motion for reconsideration of the opinion dated February 21, 2023 and the reviewing panel of the court having determined that the motion should be granted in part; now, therefore, it is hereby

ORDERED that the respondents' motion for reconsideration be granted in part and the opinion filed on February 21, 2023 be withdrawn and a substitute opinion filed.

The appellant having filed a motion for reconsideration of the opinion dated February 21, 2023, and a majority of the panel having determined the motion should be denied; now, therefore, it is hereby

ORDERED that the appellant's motion for reconsideration be, and the same is, hereby denied.

FOR THE COURT

_____
Coburn, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| TAMMY DIETRICH, individually, and as Personal Representative of the Estate of Skyler Velez and on behalf of the Statutory Beneficiaries thereto, | No. 83152-6-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| BRUCE NEELY, M.D. and "JANE DOE" NEELY, individually and as a marital community; KATHLEEN HILL, MSW and "JOHN DOE" HILL, individually and as a marital community; ADA MICHELE GUERIN, R.N. and "JOHN DOE" GUERIN, individually and as a marital community; CHELSEA BOLEY, R.N. and "JOHN DOE" BOLEY, individually and as a marital community; MAURICE WILKINS and "JANE DOE" WILKINS, individually and as a marital community; MULTICARE HEALTH SYSTEMS, INC. a Washington Corporation d/b/a MultiCare Auburn Medical Center; CASCADE EMERGENCY PHYSICIANS, INC., P.S., a Washington Corporation; "JOHN DOES" 1-10, unknown healthcare providers and their unknown spouses, individually and as a marital community; DOE HEALTHCARE ENTITIES 1-10, unknown health care entities, DOE BUSINESS ENTITIES, 1-10, unknown business entities, | |
| Respondents, | |
| JAMES VENTRESS, R.N. and "JANE DOE" VENTRESS, individually and as a marital community, | |
| Defendants. | |

COBURN, J. — Tammy Dietrich, individually and as personal representative of the estate of her son, Skylar Velez, (collectively the Estate), brought a wrongful death action against several employees of the MultiCare Auburn Medical Center emergency department and a hospital security guard. Velez voluntarily sought treatment after telling police he wanted to hurt himself with a knife or run into traffic. He subsequently denied any suicidal ideations and was released after hospital staff determined he was not a danger to himself. Later that night, a hospital security guard asked police to remove Velez after he refused to leave a construction area on the hospital's campus. Minutes later, Velez walked into traffic on a state highway and was killed. His death was ruled a suicide. The trial court ruled that statutory immunity under the Involuntary Treatment Act (ITA), Chapter 71.05 RCW, applied to all defendants and dismissed all claims at summary judgment because the alleged facts did not meet the standard of gross negligence. The Estate appeals the dismissals and several other rulings. We affirm in part, reverse in part, and remand for further proceedings.

FACTS

In the late afternoon on October 11, 2016, Skylar Velez, 25, called Auburn police from a gas station telephone. Police subsequently arrived to conduct a wellness check on Velez, who told responding officers that he wanted to kill himself with a knife or by running into traffic. Velez told the police that he had consumed methamphetamines and believed he was being followed. Velez agreed to be transported to the hospital by ambulance. The ambulance

2

transported Velez to the MultiCare Auburn Medical Center at approximately 6:30 p.m.

Triage nurse Chelsea Boley met Velez after he arrived at the hospital's emergency department. Boley noted around 6:42 p.m. that Velez had told the police that he wanted to "kill self with knife and run into traffic." The hospital took temporary possession of Velez' knife while he was at the hospital. Velez reported consuming "a line of amphetamines" at approximately 6 a.m. that day. Boley also assessed Velez' risk for suicide using an assessment referred to by its acronym, "SAD PERSONS." Boley determined that Velez met 6 out of 10 categories on the assessment, which gave Velez a score of 6 and represented a "moderate risk" for suicide. One of the points represented a "[p]revious suicide attempt or psychiatric care." Boley instituted several interventions to mitigate that risk. Velez was ordered to have a constant observer in the hospital, to have his clothing and belongings removed from his person and securely stored, and to have food and drinks served in a safe manner to prevent him from hurting himself.

Around the same time as Boley's assessment, emergency department physician Dr. Bruce Neely evaluated Velez. Medical records show his notes were entered at 6:53 p.m. Neely conducted a medical evaluation to ensure that Velez could be cleared for a social worker to conduct a mental health evaluation. During Neely's evaluation, Velez denied experiencing suicidal ideation. Velez indicated that he "has the will to live" and was not sure what the emergency department could do for him. Velez gave a "rambling history" of being in Northern California where his pack and sleeping bag were stolen. He explained

3

that he then worked his way north to Portland where his phone was stolen, before coming to the Seattle area. He said people "keep coming after him for no reason." Velez said he was dropped off in Auburn by a cousin and it was the "same shit, different toilet." Velez said he ended up talking to the police for help and they told him to go to the hospital.

Neely conducted a physical examination, finding that Velez was physically within normal limits. Regarding Velez' psychiatric symptoms, Neely noted that his behavior was "normal," his affect "blunt," his speech "rapid and/or pressured and tangential," his thought content paranoid and "possibly" delusional, his cognition and memory "impaired," and that he expressed "impulsivity" but "no suicidal plans." Under past medical history, Neely listed unspecified asthma, depression, and hypertension. Neely noted that he reviewed nursing notes and vitals. Neely also ordered blood tests including a drug screen, which was positive for amphetamines and cannabinoids. Neely later explained in a deposition that a person who has used amphetamines will test positive for them for approximately 48-72 hours after ingestion, though the effects wear off within several hours. Based on his exam and lab tests, Neely medically cleared Velez for a mental health evaluation. Neely recommended Velez follow-up with HealthPoint Auburn North in seven days.

Medical records show that the pre-hospital report from the ambulance transporters, American Medical Responses (AMR), was entered into the hospital system at 6:54 p.m. That report listed ADHD, hypertension, bipolar disorder and other PTSD in Velez' medical history. The report's narrative states Velez called 911 and told police that he wanted to hurt himself with a knife and that he also

4

had thoughts of running into traffic. It said Velez reported he was tired of being homeless and that he did some "meth" the previous night. Velez thought he was being followed by random people and kept writing down license plate numbers saying "they are following us." Neely's notes make no mention of having reviewed the AMR report, but later testified in a deposition that he did receive verbal reports from the ambulance crew when Velez was first brought to the hospital.

While under observation after triage, a patient care technician noted Velez having an "inappropriate emotional response" by yelling after being upset by a loud hospital intercom. The observation records noted that there were no other concerns and that Velez never expressed suicidal ideation during the observation period.

Velez then met with hospital social worker, Kathleen Hill, who performed a mental health evaluation because Velez had initially expressed suicidal ideation to the police. Velez told Hill that he had used meth in Seattle and traveled to the Auburn area to meet a friend. Velez said police were following him so he made suicidal statements to the police "to get their attention." Velez denied having suicidal ideation to Hill. He explained that he used his knife for killing animals for food since he was homeless and camping. Velez did not present to Hill as being paranoid or depressed. Velez told hill that he "hates it here" in Washington State and planned to "hustle for money" at freeway exits to pay his way to New Orleans. Hill gave Velez patient "resources for drop in centers to replace his ID."

Hill then consulted with registered nurse Ada Guerin and Dr. Neely and the group agreed that Velez should be discharged. Hill's chart notes indicated

that the "[s]ocial worker viewed plan with Nurse Ada and medical staff." Hill confirmed in her deposition that the "plan" was as stated in her notes: to give "resources for drop in centers to replace his ID." Hill confirmed in her deposition that Velez did not ask her to call anyone on his behalf and that she did not volunteer to do so.

Guerin provided discharge instructions to Velez, which instructed him to return to the emergency department if his symptoms worsened and recommended follow up with a primary care physician. The instructions included Neely's provisional diagnosis of "mental health evaluation" and "poly substance use" and directions to follow up in seven days at HealthPoint Auburn North, with an address and phone number listed. Velez indicated that he understood the instructions and Guerin returned his belongings. Velez then left the emergency department "in no obvious distress."

According to Hill, sometime after Velez' discharge, a security guard called her and informed her that Velez had returned and was asking for bus passes. Hill went to the lobby with the passes and handed them to Velez. Hill had no concerns about Velez after their second interaction, explaining that he did not appear to be in distress and had no change in behavior since his discharge. Hill subsequently ran into Velez outside the main entrance of the hospital while she attended to another patient. Hill saw him sitting on a bench and again had no concerns about him.

According to Auburn police records, at 11:31 p.m. that evening, hospital security guard, Maurice Wilkins, called Auburn police to report a previously discharged patient, "Skylar," in a construction area in front of the ambulance bay

6

refusing to leave. Wilkins reported that he had not seen any weapons, but reported that the male had a knife in a bag.

In a deposition taken more than four years after the incident, Wilkins stated that he could not recall the incident. Wilkins explained that he has no medical training nor any training on interacting with someone with suicidal ideations. Wilkins stated generally that he is unable to get information about why a patient is at the hospital or what they are treated for. Wilkins explained that when he encounters people on hospital property, he would generally ask if they needed assistance and if they are a patient. If someone was not a patient or visitor, he explained that he would ask them to leave but would typically offer to assist them in finding a ride or a way to their destination before he "kick[ed] them off the property or call[ed] the police."

Officer Christopher Mast responded to Wilkins' call and was informed by hospital staff that Velez had been a patient but was discharged that night. Mast spoke with Velez who stated he believed people were following him and asked for a ride to Peasley Canyon. Mast observed that Velez was cooperative and compliant during their interaction. Auburn Police records noted that Velez "ha[d] been cleared by the hospital but still thinks his life is in danger. He believes people are following him wherever he goes." Mast drove him to Peasley Canyon Road and dropped him off close to midnight.

Just after midnight, a driver struck Velez as he stood in a lane of traffic on State Route 18. Velez was initially identified by his hospital discharge papers. A subsequent investigation ruled Velez' death a suicide.

7

PROCEDURAL HISTORY

On September 19, 2019, Velez' mother Tammy Dietrich filed a wrongful death suit on behalf of herself and as personal representative of the Estate against numerous hospital providers and staff who had treated or interacted with Velez after he was brought to the emergency department prior to his death.[1]  The Estate alleged that negligence on the part of each defendant resulted in Velez' death.  The defendants jointly moved for partial summary judgment to determine whether the heightened gross negligence standard under former RCW 71.05.120(1) (2016) applied to the defendants' conduct in this case.

The Estate then moved for a continuance of the summary judgment motion under CR 56(f) to allow for additional discovery to support its position that the statute did not apply to limit defendants' liability.  The trial court denied the Estate's motion to continue.  The trial court subsequently granted the defendants' motion for partial summary judgment finding that the statutory limited immunity applied because the defendants acted to determine whether to discharge Velez or to treat him involuntarily.  The Estate subsequently moved the trial court to reconsider its application of former RCW 71.05.120(1), particularly as to hospital security guard, Wilkins.  The court denied the motion.  The Estate then amended its complaint to allege that defendants had acted with gross negligence.

---

[1] The Estate sued MultiCare Health Systems, which does business as MultiCare Auburn Medical Center; Cascade Emergency Physicians, the corporation that employed Neely and provided for his services at the hospital; Dr. Bruce Neely; social worker Kathleen Hill, registered nurse Ada Michele Guerin, registered nurse Chelsea Boley, and hospital security guard Maurice Wilkins.  The parties had previously agreed to dismiss its claims against registered nurse James Ventress.

Defendants then jointly moved for summary judgment on all claims. Alongside the joint motion, defendants submitted several expert declarations opining on whether defendants exercised slight care in deciding to discharge Velez. These declarations included those of a hospital security expert, a registered nurse, a medical doctor, and a social worker, each stating that the evidence established that the defendants did not fail to act with slight care. The Estate submitted the declarations of Dr. Anthony Haftel, MD and Michelle Sipes-Marvin, RN, who provided expert opinions as to whether the doctor, nurses, and social worker acted with gross negligence.

The Estate moved, under the deadman's statute, to prohibit testimony and to strike inadmissible evidence from declarations by defendants' experts. The court denied the motion. The court also denied the Estate's motion to disqualify the judge after the Estate learned that his daughter has a master's degree in social work and is employed as a social worker.

The trial court dismissed all claims against all defendants finding that "reasonable minds could not differ as to whether or not any of the defendants in this case failed to exercise even slight care." The trial court explained that upon its review of the evidence, the "record reveals more than slight care on behalf of every defendant."

The Estate appeals.

DISCUSSION

Judicial Disqualification

The Estate first contends that the trial court erred in denying its motion to disqualify the trial judge. The Estate argued that the trial judge's impartiality "might reasonably be questioned" under the appearance of fairness doctrine because the trial judge's adult daughter holds a master's degree in social work, which may require her to conduct suicide risk assessments.

We review whether trial judges' decisions on motions for disqualification were manifestly unreasonable or based on untenable grounds. Kok v. Tacoma Sch. Dist. No. 10, 179 Wn. App. 10, 23-24, 317 P.3d 481 (2013) (citing State v. Davis, 175 Wn.2d 287, 305, 290 P.3d 43 (2012)). A judicial proceeding satisfies the appearance of fairness doctrine if a reasonably prudent and disinterested person would conclude that all parties obtained a fair, impartial, and neutral hearing. Tatham v. Rogers, 170 Wn. App. 76, 96, 283 P.3d 583 (2012). "'The test for determining whether the judge's impartiality might reasonably be questioned is an objective test that assumes that a reasonable person knows and understands all the relevant facts.'" Kok, 179 Wn. App. at 24 (internal quotation marks omitted) (quoting Tatham, 170 Wn. App. at 96). While the asserting party need not show actual bias, it must produce sufficient evidence demonstrating actual or potential bias, such as personal or pecuniary interest on the part of the judge; mere speculation is not enough. Kok, 179 Wn. App. at 23-24 (citing In re Pers. Restraint of Haynes, 100 Wn. App. 366, 277 n. 23, 996 P.2d 637 (2000)).

10

The Estate offers no evidence that the judge's daughter was involved in this matter or that the judge has any pecuniary interest in the outcome of the case. The Estate also fails to cite any actions by the judge to support a concern for the appearance of fairness.

The Washington State Supreme Court has previously declined to find that recusal or disqualification was warranted even when the judge and her husband had worked in the offices investigating and prosecuting the case but where there was no "evidence to suggest the trial judge had any involvement . . . or interest" in the hearing. State v. Gentry, 183 Wn.2d 749, 356 P.3d 714 (2015).

The trial court did not err in denying the Estate's motion to disqualify.

<u>Partial Summary Judgment</u>

*A. Gross Negligence*

The Estate next contends that the trial court erred in granting the joint defense motion for partial summary judgment, applying former RCW 71.05.120(1) and requiring a gross negligence or bad faith standard to the claims.[2]

We review summary judgments de novo. Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019). Summary judgment is appropriate when "'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Id. (alteration in original) (internal quotation marks omitted) (quoting Rangers Ins. Co. v. Pierce County, 164 Wn.2d 545, 522, 192 P.3d 886 (2008)); CR 56(c). We must construe all facts and inferences in favor of the nonmoving party. Scrivener v. Clark College, 181

---

[2] The Estate does not allege bad faith in its claims.

11

Wn.2d 439, 444, 334 P.3d 541 (2014). "A genuine issue of material fact exists when reasonable minds could differ on the facts controlling the outcome of the litigation." Dowler v. Clover Park Sch. Dist. No. 400, 172 Wn.2d 471, 484, 258 P.3d 676 (2011). The applicable standard of care is a question of law for the courts to decide. Schneider v. Strifert, 77 Wn. App. 58, 61, 888 P.2d 1244 (1995) (citing Hansen v. Friend, 118 Wn.2d 476, 479, 824 P.2d 483 (1992)).

The Estate challenges the trial court's application of former RCW 71.05.120(1) because Velez sought treatment voluntarily. The Estate argues that because Velez voluntarily went to the hospital for treatment, the ITA does not apply, therefore the limited immunity is not applicable in this case. We disagree.

Generally, a person seeking voluntary treatment is to be "released immediately upon his or her request." Former RCW 71.05.050 (2015). However, the ITA provides an avenue for medical personnel to detain and treat a person who suffers from a psychological condition that causes them to be "gravely disabled or . . . to present a likelihood of serious harm." Former RCW 71.05.040 (2004). When a patient presents such a concern to medical staff, they "may detain such person for sufficient time to notify the county designated mental health professional of such person's condition" to enable the mental health professional to authorize further custody for treatment. Former RCW 71.05.050.

The statute also provides limitations on liability for medical professionals undertaking those decisions, stating

> No officer of a public or private agency, nor the superintendent, professional person in charge, his or her professional designee, or attending staff of any such agency, nor

> any public official performing functions necessary to the administration of this chapter, nor peace officer responsible for detaining a person pursuant to this chapter, nor any county designated mental health professional, nor the state, a unit of local government, or an evaluation and treatment facility *shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release,* administer antipsychotic medications, *or detain a person for evaluation and treatment: Provided, [t]hat such duties were performed in good faith and without gross negligence*.

Former RCW 71.05.120(1) (emphasis added).  This provision "exempts decision makers from liability for ordinary negligence under certain circumstances, substituting a gross negligence standard for duties performed pursuant to the act with regard to decisions whether to 'admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment.'" Poletti v. Overlake Hosp. Med. Ctr., 175 Wn. App. 828, 833, 303 P.3d 1079 (2013).

This court has held that where a party challenges the decision *not* to involuntarily hold someone for evaluation or treatment, "the immunity provision of RCW 71.05.120 applies because the only authority . . . to detain [them] was under [that] chapter."  Estate of Davis v. Dep't of Corr., 127 Wn. App. 833, 841, 113 P.3d 487 (2005).  This court has held that "while a hospital does have authority under the statute to detain a patient briefly to obtain a formal evaluation, the hospital will not face liability for discharging the patient without an evaluation as long as the decision is made in good faith and without gross negligence." Poletti, 175 Wn. App. at 836.  This limited immunity applies not only to the ultimate decision of whether or not to detain a patient for involuntary treatment, but "expressly includes a variety of other duties" which are "more than mere

13

mental decisions, but encompass the acts taken to effectuate those decisions." Ghodsee v. City of Kent, 21 Wn. App. 2d 762, 780, 508 P.3d 193 (2022). "Potential civil liability does not only arise from the choice to administer medications or detain an individual, but also the acts taken to carry out those decisions." Id.

Poletti presents similar facts to the instant case. Poletti arrived at an emergency room in Seattle reporting homicidal and suicidal thoughts, along with other psychiatric symptoms. Poletti, 175 Wn. App. at 831. Poletti voluntarily agreed to be admitted to the psychiatric unit, but said she felt better and asked to be discharged 18 hours after her admission. Id. She was released from the hospital and died a short time later in a single car crash. Id. Poletti's family brought a wrongful death suit against the hospital and argued that the ordinary negligence standard should apply because Poletti was not held involuntarily. Id. The Poletti court rejected that argument, noting that the "application of the gross negligence standard provided by RCW 71.05.120(1) is not limited only to decision to *detain* a person against her will. It covers decisions whether or not 'to admit, discharge, release, administer antipsychotic medications, or detain a person for evaluation and treatment.'" Id. at 835. The court found that it was "clear the legislature intended to provide limited immunity for a range of decisions that a hospital can make when a patient arrives, whether voluntarily or involuntarily, for evaluation and treatment" holding that the hospital could not be held liable for performing this duty in good faith and without gross negligence. Id.

The Estate argues that Poletti is distinguishable because unlike the patient in Poletti, Velez was never determined to be suicidal and never voluntarily

admitted to the hospital. That distinction is not material when the statute reaches decisions as to whether to release or detain for evaluation and treatment and the only reason Velez was evaluated in the hospital was for reports of suicidal ideation.

*(i) Healthcare Defendants*

In this case, the limitation on liability applies to Dr. Neely and to the hospital staff assisting in the decision not to detain Velez and assisting in the acts taken to effectuate that decision. The nursing staff, including Guerin and Boley, performed acts required to assist Neely in making the decision to release Velez. Medical records show that upon Velez' admission to the emergency department, Boley spoke with him about his admission and the suicidal ideation Velez expressed to police before he agreed to be taken to the hospital. Hospital records show that Boley conducted a suicide risk assessment of Velez during his triage at the emergency department, which indicated he was a "moderate" risk for suicide. The nursing notes reflect that Boley discussed his suicidal ideation and drug use before notifying Velez of hospital procedure and ensuring Velez understood them.

After Velez's suicide risk assessment, Hill, the emergency department's social worker, met with Velez to conduct an additional assessment based on the fact that Velez had reported suicidal ideation to police prior to hospital triage. Hill noted that Velez denied suicidal ideation and did not appear paranoid or depressed. Hill provided Velez resources for drop-in centers to replace his ID.

After evaluating Velez, Hill met with Guerin and Neely and the three agreed to discharge Velez. Neely's note on medical decision making stated,

Patient comes to the ED after allegedly making some suicidal statements to police. He had screening blood work obtained and was medically cleared for mental health evaluation. He was seen by Social Work and was not expressing suicidal ideations or homicidal ideations. He does not appear to need hospitalization. He was given resources by Social Work and will be discharged to home.

Subsequently, Guerin informed Velez of the discharge instructions and Velez expressed "understanding and demonstrated willingness to learn."

These staff were participating in the actions required to support the decision of whether or not to detain Velez for treatment and are protected by the limited immunity under former RCW 71.05.120(1). We conclude that the trial court did not err in granting partial summary judgment to require that the Estate prove its claims against Dr. Neely, Hill, Boley, and Guerin, under a higher standard of gross negligence.

*(ii) Security Guard*

However, the trial court erred in extending this limited immunity to security guard Wilkins. Wilkins did not perform duties to discharge, release or detain Velez for evaluation and treatment, nor did Wilkins participate in any "acts taken to effectuate" the decision of whether to detain a patient for involuntary treatment. Ghodsee, 21 Wn. App. 2d at 780. That decision had already been made.

Wilkins' only recorded contact with Velez occurred after Velez was discharged from the emergency department. Auburn police records show that Wilkins contacted police at approximately 11:14 p.m. to report that a previously discharged patient, Velez, was refusing to leave the property and had a knife in his bag. Because this record does not establish that Wilkins performed any

duties pursuant to the ITA, the trial court erred in ruling that the gross negligence standard applied to claims against Wilkins.

For the same reason, the trial court abused its discretion in denying the Estate's motion for reconsideration. A trial court's denial of a motion for reconsideration is reviewed for abuse of discretion, meaning discretion that is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons. River House Dev., Inc. v. Integrus Architecture, P.S., 167 Wn. App. 221, 231, 272 P.3d 289 (2012). Because the trial court applied the wrong legal standard as to Wilkins, the court's ruling was untenable.

*B. CR 56(f) Continuance*

The Estate also argues that the trial court erred in denying its motion to continue, under CR 56(f), the defendants' motion for partial summary judgment to allow the Estate more time to conduct discovery. Under CR 56(f),

> Should it appear from the affidavits of a party opposing the motion that, for reasons stated, the party cannot present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Denial of a motion for continuance will be upheld absent a showing of manifest abuse of discretion. Gross v. Sunding, 139 Wn. App. 54, 67-68, 161 P.3d 380 (2007) (citing Turner v. Kohler, 54 Wn. App. 688, 693, 775 P.2d 474 (1989)). The trial court may deny a request to continue a summary judgment motion if (1) the requesting party does not offer a good reason for the delay in obtaining the desired evidence, (2) the requesting party does not state what evidence would be established through additional discovery, or (3) the desired

17

evidence will not raise a genuine issue of material fact.  Presbytery of Seattle v. Shulz, 10 Wn. App. 2d 696, 712, 449 P.3d 1077 (2019) (quoting Kozol v. Dep't of Corr., 192 Wn. App. 1, 6, 366 P.3d 933 (2015)).

The only matter at issue in the motion for partial summary judgment was whether the defendants were subject to the gross negligence standard under the ITA.  The Estate explained that it was requesting the continuance in order to "engage in additional appropriate discovery" and to "consult with [its] experts after discovery has been obtained."  The only specific discovery the Estate sought in its motion was to "depose an MCAMC[3] representative about its policies with respect to how MCAMC personnel are supposed to respond in this type of situation."  The Estate does not explain how such a deposition would affect the court's determination of the standard of care applicable to this case. The Estate similarly fails to state how the deposition they sought would raise a genuine issue of material fact on the narrow issue of whether the gross negligence standard under the ITA should be applied to the defendants.  The trial court subsequently denied the Estate's motion.

Because the Estate did not state what evidence would be established through additional discovery or how that evidence would create a genuine issue of material fact as to the partial summary judgment, the trial court did not err in denying the Estate's motion for a continuance under CR 56(f).

---

[3] MCAMC refers to the MultiCare Auburn Medical Center.

<u>Summary Judgment</u>

Lastly, the Estate contends that the trial court improperly denied its motion to strike statements from declarations supporting summary judgment because the challenged statements are barred under the deadman's statute.  The Estate also maintains that, even under the gross negligence standard, dismissing all claims was improper.

*A. Deadman's Statute*

The Estate argues that because the challenged statements "rely in part on defendants' alleged conversations and interactions with the decedent . . . that are not found in the medical records" they are inadmissible as testimony and cannot be used to rule on a summary judgment motion.  Defendants' only response on appeal is that the Estate waived the protection by presenting expert testimony regarding the same transaction that it sought to preclude.  Instead of citing to the record, defendants only cite to their own motions below in response to the Estate's motion to strike declaration statements and opinions.

This court reviews evidentiary rulings made in connection with a summary judgment ruling de novo.  <u>Ensley v. Mollmann</u>, 155 Wn. App. 744, 752, 230 P.3d 599 (2010) (citing <u>Ross v. Bennett</u>, 148 Wn. App. 40, 45, 203 P.3d 383 (2008)).  The deadman's statute "prevent[s] interested parties from giving self-serving testimony about conversations or transactions with the deceased, because the deceased is not available to rebut such testimony."  <u>Rabb v. Est. of McDermott</u>, 60 Wn. App. 334, 339, 803 P.2d 819 (1991).  Under RCW 5.60.030, in an action where an adverse party sues as representative of a deceased person,

19

A party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased . . . person.

The deadman's statute precludes not only positive assertions that a transaction or conversation with the decedent took place, but also testimony of a "negative" character denying interactions with the decedent. Botka v. Est. of Hoerr, 105 Wn. App. 974, 21 P.3d 723 (2001). Under the statute, an interested party may testify about their own impressions as long as they do not concern a specific transaction or reveal a statement made by defendant. Kellar v. Est. of Kellar, 172 Wn. App. 562, 575, 291 P.3d 906 (2012) (citing Jacobs v. Brock, 73 Wn.2d 234, 237-38, 437 P.2d 920 (1968)).

Evidence concerning transactions with deceased presented at earlier proceedings or submitted in connections with summary judgment motion can be prohibited by the deadman's statute. Bentzen v. Demmons, 68 Wn. App. 339, 345, 842 P.2d 1015 (1993). The protection of the statute may be waived when the protected party introduced evidence concerning a transaction with the deceased. Id. This waiver applies in connection with a summary judgment motion as well as at trial. Hill v. Cox, 110 Wn. App. 394, 406, 41 P.3d 495 (2001).

While medical records are admissible under the deadman's statute because they are "not self-serving," the introduction of medical records does not waive the protections of the deadman's statute as to the estate. Erickson v. Robert F. Kerr, M.D., P.S., Inc., 125 Wn. 2d 183, 189, 883 P.2d 313 (1994).

20

"[P]arties may retain experts to make inferences based on *admitted medical records*." <u>Id.</u> (emphasis added).

While the deadman's statute is inapplicable to actions brought by Dietrich in her individual capacity, the statute applies to actions brought on behalf of Velez' estate. <u>Id.</u> at 190 (citing <u>Maciejczak v. Bartell</u>, 187 Wash. 113, 60 P.2d 31 (1936)). Thus, the following deadman's statute analysis only applies as to claims brought on behalf of the estate.

Here, the Estate alleges that the defendants attempted to introduce otherwise inadmissible testimony concerning transactions with Velez through expert witnesses. We analyze each challenged statement.[4]

The Estate first challenges statements included in the declaration of Julie Briggs, RN, BSN, MHA, an expert retained by the defense to evaluate nurses Boley's and Guerin's actions in treating Velez. This testimony was used in an expert declaration to support defendants' motion for summary judgment. The Estate argues that the expert improperly included the statement that Dr. Neely recalled "that Mr. Velez had been flirting with Nurse Boley." This statement was based on Neely's deposition when he testified to remembering "flirtatious comments" Velez made to Boley. Though the comments were not made to Neely, they were made in his presence by the deceased and, thus, subject to the deadman's statute because they were not referenced in the medical records.

---

[4] The Estate also challenges several statements in the expert declarations incorporating the testimony of security guard, Maurice Wilkins. However, as explained <u>infra</u> pp. 32-33, the Estate failed to establish a prima facie case of negligence against Wilkins, supporting the dismissal of the claims against him. Therefore, Wilkins' testimony is not that of a party in interest to a transaction with the decedent and need not be struck.

The Estate did not use or rely on this statement prior to defendants' submission of Briggs' declaration. The trial court erred in denying the Estate's motion to strike this statement.

The Estate next challenges Briggs' inclusion of the statement from Guerin's deposition testimony that "she verbally confirmed with [Velez] that he could keep himself safe and that he knew how to get help if this was no longer the case." This statement, also not referenced in the medical records, was first introduced by defendants in their joint motion for summary judgment.

Defendants contend that the Estate waived the protections of the deadman's statute because it first introduced this statement through a report from its experts Haftel and Sipes-Marvin filed on April 29, 2020 in support of a motion to continue, as well as documents from Haftel filed in support of the Estate's motion for summary judgment. The Estate filed its motion for summary judgment about five hours before defendants filed their joint motion for summary judgment. However, the introduced statements defendants cite to consist of the expert's opinions that Velez was not given suicide referral information and that "[t]here was a complete failure to . . . implement an actual safety plan." The Estate did not *first* introduce in its motion for summary judgment or supporting expert reports that Guerin testified that "she verbally confirmed with [Velez] that he could keep himself safe and that he knew how to get help if this was no longer the case."

We conclude that this statement is a statement from a party in interest about a transaction with the deceased and that the trial court erred in denying the Estate's request that it be stricken under the deadman's statute.

22

The Estate also challenges Briggs' reliance on a statement from social worker Hill's deposition that the resources Hill provided Velez "were set forth on preprinted sheets that contained a variety of resources, including drop-in centers to replace ID, food pantries, shelters, and the crisis hotline phone number." This testimony was first introduced by the Estate. A transcript of Hill's testimony was filed as an exhibit in support of the Estate's motion for summary judgment. Thus, the Estate waived the protections of the deadman's statute by introducing the statement first. As a result, Briggs was not precluded from relying on Hill's statements about her interactions with the deceased. The trial court did not err in denying the Estate's motion to strike the statement.

Next, the Estate challenges several statements relied on and first introduced by defendant expert Megan Moore regarding Hill's conduct as a social worker in evaluating Velez.

The first challenged statement is Moore's reliance on Hill's deposition testimony that Velez "denied suicidal ideation, in response, and said that he had just been 'f***ing' with the police." Hill's notes in the medical records reflected that Velez told Hill "police were following him and he made the SI statements to get their attention." In her deposition testimony, Hill elaborated that Velez had actually told her he was "fucking" with the police, but that she had not written his words verbatim in her report. Defendants correctly cite to the record establishing that the Estate filed a copy of a transcript of Hill's challenged statement prior to its introduction by defendants and waived protections of the deadman's statute. The trial court did not err in denying the Estate's motion to strike the statement that alleged the exact language Velez used.

The next statement challenged is expert Moore's reliance on Hill's deposition testimony that Hill "inquired about the existence of any prior suicidal ideation or attempts, which Mr. Velez denied." There was no evidence of this interaction in the medical records and nothing in the record supports that the Estate previously introduced such statement. Therefore, we conclude that the trial court erred in denying the Estate's motion to strike this challenged statement.

The Estate also challenges Moore basing an inference on Hill's testimony that "Mr. Velez also stated that he had traveled to Washington to 'meet a friend' which shows that Ms. Hill inquired into whether Mr. Velez had any sort of support structure in place." This statement however, was included in the medical records in Hill's note that "Pt stated he used meth in Seattle and traveled here to meet a friend." As a result, we conclude that the trial court did not err in denying the Estate's motion to strike that statement.

Next, the Estate challenges Moore's reliance on Hill's testimony that "Mr. Velez' hygiene appeared to have been well-maintained." This is not based on a transaction with the decedent, but on Hill's observations of him, which are permitted under the deadman's statute. Under the deadman's statute, an interested party may testify about their own impressions as long as they do not concern a specific transaction or reveal a statement made by defendant. Kellar, 172 Wn. App. at 575 (citing Jacobs, 73 Wn.2d at 237-38). We conclude that the court did not err in denying the Estate's motion to strike this statement.

The Estate lastly challenges Moore's inclusion of the statement "Additionally, Ms. Hill provided Mr. Velez with a bus pass at his request, after he

was discharged." This information was first introduced by the Estate in an exhibit filed with its April 24, 2020 motion to continue, more than a year before defendants filed their joint motion for summary judgment which included Moore's opinion. The Estate's exhibit included a letter from the hospital indicating that interviews with the staff, including the social worker involved in Velez' case, revealed that Velez had returned an hour after discharge requesting a bus pass. We conclude that the trial court did not err in declining to strike the statement because the Estate waived the statutory protection by first introducing it in its motion to continue.

*B. Decision to Release*

To prevail on its claims relating to the decision to detain or release Velez, the Estate was required to show that the relevant defendants' actions failed to follow the gross negligence standard of care and that this failure caused Velez' death. See Keck v. Collins, 184 Wn.2d 358, 371, 357 P.3d 1080 (2015). "Gross negligence" is negligence substantially and appreciably greater than ordinary medical negligence. Nist v. Tudor, 67 Wn.2d 322, 331, 407 P.2d 798 (1965). "To avoid summary judgment on gross negligence, a plaintiff must present 'substantial evidence that the defendant failed to exercise slight care under the circumstances presented, considering both the relevant failure and, if applicable, any relevant actions that the defendant did take.'" Dalen v. St. John Med. Ctr., 8 Wn. App. 2d 49, 61, 436 P.3d 877 (2019) (quoting Harper v. Dep't of Corr., 192 Wn.2d 328, 343, 429 P.3d 1071 (2018)). Under the ITA, an incomplete or even unreasonable assessment does not necessarily rise to the level of gross negligence under the exemption statute. Id. at 62.

Expert testimony is generally required to establish the standard of care in a medical malpractice case. Eng v. Klein, 127 Wn. App. 171, 176, 110 P.3d 844 (2005) (citing Young v. Key Pharms., Inc., 112 Wn.2d 216, 228, 770 P.2d 182 (1989)). This requires the plaintiff to present expert testimony to establish both the standard of care expected of a Washington healthcare provider and to explain how the care given to the patient fell short of that standard. Harris v. Robert C. Groth, M.D., Inc., P.S., 99 Wn.2d 438, 448-49, 663 P.2d 113 (1983); Hill v. Sacred Heart Med. Ctr., 143 Wn. App. 438, 446, 177 P.3d 1152 (2008). Typically, the practitioner of one school of medicine is incompetent to testify as an expert in a malpractice action against a practitioner of another school of medicine. Eng, 127 Wn. App. at 176 (citing Miller v. Peterson, 42 Wn. App. 822, 831, 714 P.2d 695 (1986)). A physician is permitted to testify regarding a nurse's standard of care. Hall v. Sacred Heart Med. Ctr., 100 Wn. App. 53, 60, 995 P.2d 621 (2000) (holding that the director of an intensive care unit had "sufficient medical training and nursing supervisory experience" to testify to the standard of care expected of critical care nurses).

To establish the standards of care in this case, the Estate, on appeal, largely relied on the testimony and depositions of their expert, Dr. Anthony Haftel, who had previously directed emergency departments and served as a chief medical officer in a large healthcare system.[5] Haftel described the standard of care, focusing on what the providers should have done in order to show they exercised slight care and opined that they had failed to exercise it.

---

[5] The Estate also presented expert testimony from Michelle Sipes-Marvin, R.N. in the summary judgment proceedings, but does not rely on her testimony on appeal.

If a review of all the evidence suggests that reasonable minds could differ on whether the defendant may have failed to exercise slight care, then the court must deny the motion for summary judgment. Harper, 192 Wn.2d at 346. But if a review of all the evidence reveals that the defendant exercised slight care, and reasonable minds could not differ on this point, then the court must grant the motion. Id.

Based on the evidence presented to the trial court, reasonable minds could not differ as to whether the healthcare providers exercised slight care. We conclude that the trial court did not err in dismissing claims related to whether the healthcare providers were grossly negligent in acts taken to effectuate the decision to release Velez from the hospital. We analyze the actions of each of the healthcare providers in turn.

*(i) Nurse Boley*

The Estate first alleges that Nurse Boley failed to exercise slight care in the triage and suicide risk assessment she conducted with Velez.

Upon Velez' presentation to the emergency department, Boley met with Velez to conduct a triage assessment. Boley noted that Velez presented to the hospital for suicidal ideation, writing that the patient "told cops that he wanted to kill self with knife and run into traffic." Boley noted Velez' report that he had ingested "a line of amphetamines" early in the morning that day. After Velez was admitted, Boley conducted a suicide risk assessment, which provides a score for each risk factor present. Boley's assessment showed that Velez had a score of six, which according to the medical records indicates a "moderate risk" of suicide.

The Estate argues that Boley failed to obtain an accurate score on the SAD PERSONS scale by failing to include an additional point because Velez was 25 years old. Boley correctly scored the assessment tool available to her in the hospital because that tool instructed that a point be given if the patient's age was "< 19 or > 45." However, the tool did not comply with the hospital's own suicide assessment and intervention policy. Under the policy, a point should be given on the SAD PERSONS scale if the patient's age is "25-34; 35-44; 65+". If Velez' score was a seven on the SAD PERSONS scale, according to the policy, it would have represented a category of "very high risk, hospitalize or commit."

Haftel, the Estate's expert, opined that "Boley's failure to follow the simple form was gross negligence and led to the failure of Skyler being offered hospitalization and/or detained." Haftel also noted that the hospital "negligently posted a SAD PERSONS form in EPIC[6] which did not include the correct fields and point assignments." Accoring to Haftel, "[t]his falls way below the standard of care expected of a reasonably prudent nurse acting in similar circumstances and is grossly negligent."

Under the hospital's policy, nursing staff will complete SAD PERSONS evaluation on all patients suspected of experiencing suicidal ideation or behavior in the emergency department. Boley did that. Patients who score 5+ in the emergency department will initiate a referral.

> Patients suspected of experiencing suicidal ideation or behavior while on the inpatient setting will be referred to clinical Crisis/social worker and or psychology, psychiatry or psychiatric nurse practitioner where these services are available. Where these

---

[6] EPIC is an electronic record keeping system.

28

services are not available county specific community health services will be accessed.

In fact, Velez was referred to social worker Hill who conducted a mental health evaluation. The policy also provides that

Patients that score 5 or higher on SAD PERSONS evaluation or in the inpatient setting upon identification of suicidal ideation or behavior will be placed in direct observation and will be placed with a 1: 1 constant observer.

Velez was placed under 1:1 observation and sometimes even 2:1 observation. The medical record also reflects that observations recorded every 15 minutes. At no point during the time of observation did Velez indicate that he was experiencing suicidal ideation.

Pursuant to this risk score, Boley noted several interventions to mitigate Velez' risk of suicide. In addition to having a constant observer, Boley noted that his food and beverages would be served in a safe manner. Velez' belongings were removed and secured, including his knife, he was provided hospital clothing, and he was notified of procedures.

Though Haftel addressed what he believes Boley should have done, he ignores what Boley did do. Viewing all the evidence, reasonable minds could not differ that Boley exercised slight care.

*(ii) Dr. Neely*

The Estate next argues that Neely was grossly negligent in his treatment and decision making in Velez' case. The Estate argues that Neely failed to review and recognize that Boley underscored Velez on the SAD PERSONS assessment. The Estate also argues that Neely failed to make a medical or

29

psychiatric diagnosis of an individual presenting to the ER "who was almost certainly having a manic, schizo-affective break."

Haftel observed that Neely noted Velez' "affect is blunt. His speech is rapid and/or pressured and tangential.  Thought process is paranoid and delusional (possibly). Cognition and memory are impaired.  He expresses impulsivity.  He expresses no suicidal plans."  Haftel opined that the "recorded observations of Skyler clearly demonstrates a patient who was almost certainly having a manic, schizo-affective break and, therefore, at high risk for suicide.  This would have been recognized by any emergency physician exercising slight care."  In his deposition, Neely explained that the paranoid and delusional notation referred to Velez reporting that he thought people were following him around and from place to place.  Neely noted "possibly" next to the entry because he had no way of telling if that was actually happening.  Neely explained that the notation, "Cognition and memory are impaired" was more of a result of the functionality of the note-writer application he used at that time to enter his notes into the hospital's electronic records system.  There was only one check box for cognition and memory.  Neely selected it because he thought Velez' memory was slightly impaired because he did not have a good description of what had led up to the incident with the police.  Neely testified that Velez demonstrated some impulsivity when he interrupted the ambulance crew when they tried to talk to medical staff, but the limitation in the documentation system entered the note as "expresses impulsivity."

The evidence shows that Neely assessed Velez and found that he did not appear to be at risk of suicide.  Neely explained that in a situation like this, his

30

main job is to perform a medical evaluation to ensure the patient is medically cleared for a social worker to conduct a mental health evaluation, and then discuss treatment options with the social worker. Neely met with Velez after his arrival to the emergency department, noting that Velez was "very cooperative" and "didn't give any indication that he was under the influence of alcohol or drugs." Neely noted that Velez "denie[d] suicidal ideations, sa[id] he has the will to live and is not sure what we can do for him in the [emergency room]." Neely ordered blood work and consulted with Hill and Guerin before they agreed to discharge Velez.

It is not enough that the Estate presents an expert who has a different medical opinion than Neely's. Under the gross negligence standard, reasonable minds could not differ in concluding that Neely exercised slight care.

*(iii) Social Worker Hill*

The Estate next claims that Hill was grossly negligent in her evaluation and discharge of Velez. Dr. Haftel was particularly critical of Hill's conclusion that Velez was appropriate to be released because he had a "forward-thinking plan." Haftel contends that Hill failed to address and discuss whether Velez had a job lined up, or family support and medical support lined up in New Orleans. Haftel opined that concluding Velez' plan to be reasonable and forward-thinking "is obviously gross negligence and shows a complete disregard for even a slight degree of care or safety being directed toward Skyler." Defense expert Moore, opined that Hill covered the necessary points of an appropriate biopsychosocial assessment that complies with the standard of care. Moore explained that having a forward-thinking plan is a factor known to suggest that a person is not at

31

credible risk of self-harm and examples of that included Velez' plan to panhandle for money so he could travel to New Orleans, and expressing that he lost his ID and needed a new one to facilitate that plan.

Again, under a gross negligence standard, the question is not whether Hill could have done more. We must look at the entire record, including what Hill did do. Doing so, we conclude that reasonable minds could not differ as to whether Hill exercised slight care. Hill conducted a mental health evaluation and Velez denied suicidal ideation. Hill noted that Velez "did not present as paranoid or depressed" and that he had a plan to travel to New Orleans upon his release. As part of this plan, Hill provided Velez with resources to replace his ID. Following Hill's assessment, she consulted with Neely and Guerin[7] and the three agreed to discharge Velez.[8]

*C. Security Guard*

As explained supra, Wilkins is not subject to the gross negligence or bad faith standard provided under former RCW 71.05.120(1), but he is subject to claims of negligence. The Estate claims that Wilkins was negligent in failing to permit and/or assist Velez to re-enter the hospital for medical care and in calling the police to have Velez removed from the hospital property.

---

[7] Although the Estate also claimed below that Guerin had been grossly negligent in her treatment of Velez, the Estate did not brief this issue as to Guerin on appeal. As a result, we decline to address the dismissal of claims against Guerin as to this issue. Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

[8] Because we conclude that Hill exercised slight care, we need not address whether Haftel was a qualified expert to opine as to the standard of care of a hospital's social worker in the emergency department.

To make a prima facie case of negligence, a plaintiff must prove four elements: (1) duty, (2) breach, (3) causation, and (4) damages. Ghodsee, 21 Wn. App. 2d at 768 (citing Ranger, 164 Wn. 2d at 552). If any of these elements cannot be established, summary judgment for the defendant is proper. Ranger, 164 Wn.2d at 552.

In support of its motion for summary judgment, Wilkins submitted expert testimony from Alieu Ann, hospital assistant administrator for Harborview Medical Center. Ann previously was its director of the Department of Public Safety and oversaw the security department. Ann reviewed the Auburn Police records of its interaction with Velez when Wilkins called police for assistance, Wilkins' deposition and hospital policies and regulations. Ann testified that Wilkins fully complied with the standard of care in his interaction with Velez following his discharge.

The only expert testimony the Estate offered was that from Dr. Haftel, who criticized Wilkins for calling the police instead of alerting hospital staff that Wilkins may need help, but did not opine as to the standard of care for hospital security guards.[9] Haftel is a former emergency room doctor and was previously director of Division of Emergency Medicine at St. Joseph Medical Center and vice president for quality and associate chief medical officer at Franciscan Health Systems. Haftel does not establish any specialized knowledge, education, or experience in hospital security.

---

[9] We note that responding police, before dropping Velez off as he requested, was advised by "hospital staff" that Velez had been evaluated and cleared by the facility.

Because the Estate has failed to establish a prima facie case of duty and breach, the trial court did not err in dismissing all claims against Wilkins.

*D. Safety Plan*

The Estate also claims that defendants failed to complete or implement a safety plan as required by the hospital's own policies prior to discharging him from the hospital.

Defendants' response treats all of the Estate's claims as relating to "duties . . . with regard to the decision of whether to admit, discharge, release . . . or detain" Velez. However, the Estate identified a claim that the healthcare providers failed "to provide him appropriate care or direction for his suicidal ideations and thoughts" in addition to failing to "properly assess, failing to admit him as an inpatient to the hospital or another facility."

We recognize that in some circumstances, a decision whether to detain or release a patient under the ITA may include discussions and actions related to a safety plan. If that were the case, then it may be possible that actions related to a safety plan also are encompassed under the limited immunity statute of the ITA. However, based on the record before us, that is not the situation in this case. The record before us does not establish that the healthcare providers discussed any contemplation of a safety plan[10] in their decision to discharge

---

[10] Section III of the hospital's suicide assessment and intervention policy addresses discharge requirements:

A. Medical staff will assure that reasonable discharge/transfer plan is in place for all patients presenting with mental health illness/behavior or suicidal ideation.

B. Develop a reasonable discharge/transfer plan with Physician, where available, Social Work and Psychiatrist/Psychology/Psychiatric ARNP.

Velez. Thus, the Estate's claim that the healthcare providers failed to formulate an adequate safety plan is subject to the ordinary medical negligence standard.[11]

To show that the release plan was inadequate and was a proximate cause of Velez' death, The Estate must show four elements: (1) duty, (2) breach, (3) causation, and (4) damages. Ghodsee, 21 Wn. App. 2d at 768 (citing Ranger, 164 Wn.2d at 552). "'A proximate cause of an injury is defined as a cause which, in a direct sequence, unbroken by any new, independent cause, produces the injury complained of and without which the injury would not have occurred.'" Rounds v. Nellcor Puritan Bennett, Inc., 147 Wn. App. 155, 162, 194 P.3d 274 (2008) (quoting Fabrique v. Choice Hotels Int'l, Inc., 144 Wn. App. 675, 683, 183 P.3d 1118 (2008)).

Defendants' expert, Julie Briggs, confirmed that when handling discharge for a patient who was evaluated for suicidal ideation and cleared, the nurse may participate in safety planning as well as other providers involved in the patient's care, such as a social worker.

---

This discharge plan will include a patient safety plan and referrals to appropriate services.

C. All interventions, specific comments made by patient, and concerns related to patient's suicidal ideation or behavior will be documented in the EMR.

The policy's outpatient guidelines address situations when patients do not have current suicidal thinking or even when a patient denies such thinking but the provider continues to suspect risk of suicide. The guidelines call for an "[i]ndividualized safety plan if patient is not admitted to inpatient psychiatric care." It requires documenting the safety plan in the patient's medical record. It notes that a safety plan may include identifying supportive people: "Who is available to support and monitor patient? Identify frequency/duration/extent/conditions of monitoring."

[11] The "ordinary medical negligence standard" is referring to the standard of care outlined in chapter 7.70 RCW.

Because the trial court dismissed all claims and all defendants under the gross negligence standard, the parties did not litigate and the trial court did not consider if the Estate established a prima facie case of negligence as to whether Velez was released with an appropriate safety plan. We reverse the dismissal of this claim as to all remaining defendants. Nothing prohibits the trial court from entertaining summary judgment motions as to this claim under the negligence standard on remand.[12]

## CONCLUSION

We affirm the trial court's denial of the Estate's motion to disqualify the judge. We affirm the trial court's denial of the Estate's motion to continue the defendants' partial summary judgment motion to allow for additional discovery under CR 56(f).

As discussed supra at pp.19-25, we reverse in part and affirm in part the trial court's denial of the Estate's motion under the deadman's statute to strike the challenged statements in the experts' opinions. We affirm the trial court's partial summary judgment order ruling that the gross negligence standard under former RCW 71.05.120(1) applies to the healthcare providers who treated Velez in the emergency department. We also affirm the dismissal of all claims against the healthcare providers relating to the decision to release Velez after evaluating him for suicidal ideation.

---

[12] Defendant MCAMC conceded below that it is vicariously liable for the conduct of its employees and defendant Cascade Emergency Physicians (CEP) conceded below it is vicariously liable as to its employee Dr. Neely. Thus, to the extent the claims against the individual providers are dismissed or reversed, so too are claims of vicarious liability against MCAMC and CEP.

We affirm the trial court's dismissal of all claims against Wilkins, though we recognize the court erred in applying the gross negligence standard to Wilkins and further erred in denying the Estate's motion to reconsider that ruling.

Because the record in this case establishes that consideration of a safety plan was not part of the decision to release Velez after evaluating for suicidal ideation, the Estate's claim that the health providers did not provide appropriate care and direction to Velez when he was released survives the court's dismissal of claims under the gross negligence standard. We reverse the dismissal of this claim as to the healthcare providers. Because the parties did not litigate and the court did not consider this claim under the correct standard, nothing prohibits the trial court from entertaining summary judgment motions as to this claim under the negligence standard on remand.

Coburn, J.

WE CONCUR:

Chung, J.

Andrus, J.P.T.

37