IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JADA PRICE AND ASA HARRIS, | No. 86085-2-I |
| Appellants, | |
| v. | DIVISION ONE |
| STATE OF WASHINGTON, | UNPUBLISHED OPINION |
| Respondent. | |

COBURN, J. — As adults, former foster children Jada Price and Asa Harris[1] sued the Department of Social and Health Services (DSHS),[2] alleging negligence in failing to protect them from physical and sexual abuse when they were young children. The trial court dismissed all their claims at summary judgment. Plaintiffs appeal the summary judgment dismissal of their sexual abuse claims, arguing that the evidence established questions of fact as to whether DSHS breached its (1) statutory duty to investigate under chapter 26.44 RCW and (2) common law duty to protect foster children from foreseeable harms.

Because the plaintiffs admittedly never reported the sexual abuse, they did not present facts supporting their claim that DSHS violated its statutory duty to investigate.

---

[1] The general practice of this court is to refer to juveniles and victims of sexual assault by their initials. However, in this case, appellants filed their complaint as adults in the trial court with their full names in the caption and use their full names in their briefing. We follow their lead in how they choose to identify themselves.

[2] In July 2018 DSHS transferred child welfare responsibilities to the Department of Children, Youth, and Families (DCYF). RCW 43.216.906. DCYF is the defendant in this case.

However, we hold that questions of fact remain as to whether DSHS breached its common law duty to protect the plaintiffs when they were young children in foster care. Accordingly, we affirm in part, reverse in part, and remand for further proceedings as to plaintiffs' sexual abuse claims pursuant to DSHS' common law duty to protect foster children under its custodial care.

FACTS

DSHS placed plaintiffs, siblings, in the care of Josephine Carter on November 25, 1985. Plaintiffs allege that they were physically abused by Carter, their foster parent; and sexually abused by their babysitters and neighbors Rosemary and Robert (Bob) Funk. Plaintiffs, now adults, filed suit in September 2022. The alleged facts in their second amended complaint consisted of two paragraphs:

> 4.  In the mid to late 80's, the Plaintiffs were physically, sexually, and mentally abused throughout their placements, including the Carter foster home where not only were they abused in the home, but a neighbor was allowed to abuse these plaintiffs as well.

> 5.  Plaintiffs routinely disclosed the abuse to their state social workers, but these disclosures were ignored, and the Plaintiffs continued to be subjected to the abuse.

In their individual declarations submitted as part of their opposition to the State's summary judgment motion, plaintiffs stated they were "physically abused in the Carter foster home from inception to the time that I left." In these same declarations, plaintiffs also stated they were sexually abused by the Funks starting around 1985 or 1986. Born in July 1978, Price would have been between 6 and 8 years old at the time.[3] Price stated

---

[3] There is variance in the plaintiffs' testimony about when the sexual abuse may have started and/or its duration. We recite facts in a light most favorable to the plaintiffs. See Jenson v. Scribner, 57 Wn. App. 478, 480, 789 P.2d 306 (1990).

she was sexually abused by Rosemary[4] for about six months. Price is almost two years older than Harris. Harris stated he was sexually abused by Bob for several years. On May 10, 1988, a guardianship was established for Price. On June 10, 1989, a guardianship was established for Harris.

In respect to physical abuse, Price testified Carter and Carter's adult children "[would] [w]hoop us with belts, extension cords, hangers, and pull us by our ears." Price told "Mrs. Grant," a social worker, about the physical abuse. Price knew Grant was a social worker because she "used to see her badge, and she used to be in that office." Price told Grant "[t]hat we didn't want to live … [at the Carter home] no more, we were being abuse—we were abused there." When she was in sixth grade, Price told a "worker" at her school about the physical abuse in the Carter foster home. Price reported to social workers "that we were being abused, being whooped, snatched by our ears, and we were being mistreated in that home." Harris testified that adults in the Carter foster home gave him "whoopings for anything." Harris described being told to pull his pants down and being hit with "[a] belt, extension cord, … some spoon, whatever is around."

Regarding sexual abuse, Price testified that Rosemary kissed and molested her in Price's private downstairs bedroom in the Carter foster home. Price said Rosemary was "designated" as the children's babysitter. Price testified the sexual abuse never happened at Rosemary's home. Price explained:

> When Rosemary used to come over … the ones that were left behind
> from … [Carter's] trip, they would be outside, and they would be playing or
> they would be upstairs in their room playing, and she would be down in the
> room with me.
> …
> [W]hen she started coming over to our house, because I couldn't really go

---

[4] For clarity, we use first names for parties that share the same last name.

over to her house that much anymore because … [Carter] wanted her to always be over at our house to care for us, you know, … then she started trying to like French kiss me and stuff, and then I was like, "This is not right," you know, but I knew I couldn't tell … [Carter] because … [she] would be like, "Stop lying. You're just a fucking liar," you know, just–it's that, you know.

That yelling and cussing at us, we were just always liars.

….

Then a couple times … [Rosemary] molested me, stuck her fingers in my vagina a few times … [at Carter's] house in my room while the kids were upstairs or outside playing.

Price testified that the sexual abuse

progressed to where I'm laying in my bed, … [Rosemary is] laying in my bed with me, and she is taking her fingers and she's putting them in my private area.

She wanted me to wear dresses while she took care of me, like summer dresses and stuff because this is like probably around times when … [Carter] would go out of town, like spring and summer, you know, to go visit her mom down in Port Townsend and her family down there.

She would probably go maybe about two or three times within spring and summer.

Rosemary penetrated Price's vagina with her fingers "[a]bout four or five times." Price testified Rosemary eventually stopped because Carter "cut her off" and "she wasn't allowed to come over anymore."

Harris described a time at the Funks' house when Bob took Harris into the bathroom and said he needed to teach Harris how to wash himself in the shower. Harris described the abuse as progressing to oral sex, and then to Bob "having sex" with Harris using his hands at first and then his penis. Harris testified it was two or three showers before Bob first touched him, and that Bob had sex with him 15 times over three years. Harris testified the sexual abuse occurred both at Bob's home and at Harris' foster home where Bob "was coming over the whole time." Harris said "[w]henever" Carter "needed a babysitter and it was just us foster kids there," the Funks came over to the foster home. Harris explained Bob sexually abused him "a couple times at … [Bob's] house, but more

4

so it would be when … [Bob] would come over and babysit because … we would act like we got stuff to do so we didn't have to go over there sometimes."

Neither Price nor Harris told anyone else about the Funks' sexual abuse. Price did not tell Carter because "I knew I wouldn't be believed." Price testified she did not tell Carter "that I was penetrated [by Rosemary] … because if I would have told her that, I would have been a liar." Harris said, although he told his sister Price about the sexual abuse "all the time," he did not tell anyone else about being sexually abused by Bob because he was embarrassed.

Plaintiffs both stated, "Rarely, if ever, did any social worker ever come to inquire about my health and safety." Price testified she did not tell any social workers about the sexual abuse "because at the end of the day, … I don't recall a social worker ever coming to the house and talking to us. … I don't really ever [recall] seeing a social worker come there. … I used to have to go down–sneak down to that [DSHS] office and talk." Price said:

> … I asked myself, "Why do we wait so long … to say something, you know?"
> It's this very reason, people don't believe us, you know. Who do we talk to?
> I tried to go down to that social office several times.
> I can't say that a social worker has never came because I don't know … but I went down to that social office several times and tried to talk to a social worker about what was going on.
> Eventually I probably would have told … but because I wasn't getting the right–the proper guidance that I needed, and … I didn't want to leave my brothers in foster care at the home–and that was my biggest fear, leaving them behind, and I was not going to.

When asked if he ever told a social worker that he was being sexually abused, Harris said, "A social worker never came. I mean, the only time I got a chance to tell a social worker–one time they did come, and I was trying to get it out to them." Harris also

testified that, to get attention, he once falsely told someone at school that he had sex with Rosemary. After he was asked if a social worker came in response to this statement about Rosemary, Harris answered, "I guess. They came a little after that— that's when the caseworker came, but I never got to talk to them about nothing."

Both plaintiffs stated that "if a social worker had taken me aside and asked me privately if I was felt [sic] safe and/or was being abuse [sic], I would have disclosed the things that were occurring to me while placed in the Carter foster home. This never occurred." Plaintiffs stated they did not know that DSHS had the obligation to check on them monthly at the foster home "because the social workers never did it."

Harris said when he was about 11 he tried to block the sexual abuse by Bob out of his head and never brought it up or talked about it again. Around 2018 or 2019, Harris started writing a book about it and learned Price had also been sexually abused.

After the plaintiffs filed their lawsuit and gave their depositions, DCYF moved for summary judgment. In addition to excerpts from plaintiffs' depositions, DCYF submitted an excerpt from the deposition of plaintiffs' DSHS expert, former state director for foster care Barbara Stone. Stone worked for 33 years for DSHS and specialized in child sexual abuse, including supervising social workers specializing in sexual abuse investigations for 10 years. Stone testified that she reviewed the DSHS file for the plaintiffs and found, to her knowledge, the plaintiffs did not report sexual abuse until their lawsuit against DCYF. Stone also testified that both the DSHS assigned social worker and foster home licensor "had equal responsibility to be visiting the home and monitoring what's going on with the children and to be talking with the children."

In opposition to DCYF's summary judgment motion, plaintiffs filed declarations from

6

Stone, Harris, and Price. In her declaration, Stone stated that DSHS social workers were required to complete monthly monitoring visits of every foster child during the time period the plaintiffs reported they were abused in foster care. "At each visit, the social worker is obligated to conduct an interview of each foster child, in private, and inquire about their safety." Stone opined that DSHS' failure to complete regular monitoring visits "likely resulted in the missed opportunity to prevent the ongoing abuses [of plaintiffs]," including the Funks' sexual abuse of them.

Stone also stated that Price's report of abuse to "Mrs. Grant" "should have prompted a mandatory report to Child Protective Services and subsequent investigation." Stone opined:

> During the ensuing investigation, each foster child, including Ms. Price and Mr. Harris, should have been interviewed in a safe environment and specifically asked if they were being abused in any way. If the abuse as described in the plaintiffs' depositions was disclosed by any foster child, all the remaining foster children in the Carter foster home should have been permanently removed.

The court ruled that the physical abuse claims are barred by statute of limitations.[5] The court determined that the sexual abuse claims were not barred by the statute of limitations,[6] but nevertheless dismissed these claims because there was "insufficient and speculative evidence to create a duty on behalf of DCYF." The court later denied plaintiffs' motion for reconsideration on the sexual abuse claims. Plaintiffs appeal.

---

[5] Plaintiffs do not appeal the trial court's dismissal of the physical abuse claims.

[6] In a third-party negligence claim based on intentional child sexual abuse, the statute of limitations does not begin to run until the victim makes the causal connection between the third party's negligent act and the injury resulting from the act. Wolf v. State, 2 Wn.3d 93, 108, 534 P.3d 822 (2023).

DISCUSSION

Standard of Review

We review summary judgment de novo. Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019). We thus engage in the same inquiry as the trial court. Green v. Normandy Park, 137 Wn. App. 665, 681, 151 P.3d 1038 (2007). Summary judgment is appropriate when "'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.'" Strauss, 194 Wn.2d at 300 (alteration in original) (internal quotation marks omitted) (quoting Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008)); CR 56(c). "The purpose of summary judgment is to avoid useless trials where there is no genuine factual issue to be decided." Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 217, 522 P.3d 80 (2022). A trial is not useless if there is a genuine dispute as to any material fact, which is a fact that the outcome of litigation at least in part depends upon. Id. at 216-17. "A genuine issue of material fact exists when reasonable minds could differ on the facts controlling the outcome of the litigation." Dowler v. Clover Park Sch. Dist. No. 400, 172 Wn.2d 471, 484, 258 P.3d 676 (2011).

The party moving for summary judgment bears the initial burden of showing that there is no disputed issue of material fact. Haley, 25 Wn. App. 2d at 216 (citing Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989)). The burden then shifts to the nonmoving party to present evidence that an issue of material fact remains. Id. The nonmoving party may accomplish this by setting forth facts and documents that would be admissible as evidence through affidavits, depositions, answers to interrogatories, or admissions. CR 56(e). We must construe all facts and reasonable inferences from such

8

evidence in favor of the nonmoving party. Haley, 25 Wn. App. 2d at 217 (citing Boyd v. Sunflower Props. LLC, 197 Wn. App. 137, 142, 389 P.3d 626 (2016)). The trial court may not weigh the evidence, assess credibility, consider the likelihood that the evidence will be proven true, or otherwise resolve issues of material fact. Id. "When the evidence at summary judgment is susceptible to competing reasonable inferences, some supporting liability and others not, a fact question is presented that a jury must determine." Asphy v. State, 31 Wn. App. 2d 605, 630, 552 P.3d 325 (2024).

Duty of Care

The threshold question in any negligence action is whether the defendant owed a duty of care to the plaintiff. Taylor v. Stevens County, 111 Wn.2d 159, 163, 759 P.2d 447 (1988). Absent a duty, the plaintiff's claim fails. Folsom v. Burger King, 135 Wn.2d 658, 671, 958 P.2d 301 (1988). A duty of care may exist by virtue of the common law or a statute. Mathis v. Ammons, 84 Wn. App. 411, 416-17, 928 P.2d 431 (1996). The existence of a duty is a question of law that we review de novo. Hertog v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). Once the defendant's duty is established, whether the defendant breached the duty and whether that breach proximately caused the plaintiff's harm are questions of fact. Yonker v. Dep't of Soc. & Health Servs., 85 Wn. App. 71, 76, 930 P.2d 958 (1997).

*A. Statutory Duty to Investigate*

Plaintiffs contend that DSHS breached its statutory duty under RCW 26.44.050[7] by negligently failing to investigate Price's report that abuse was occurring in the Carter foster

---

[7] At the time of the alleged abuse, former RCW 26.44.050 (1984) applied. Despite multiple amendments, the language of the statute relevant to this opinion has not materially changed. For this reason, we refer to the current version.

home. Plaintiffs argue that Price's report to her social worker Grant about the physical abuse in the foster home should have resulted in an investigation to any abuse that may be occurring in the foster home. See former RCW 26.44.030(1) (1984).

It has long been recognized that under RCW 26.44.050 DSHS has an implied duty to investigate reports of child abuse.[8] Tyner v. Dep't of Soc. & Health Servs., 141 Wn.2d 68, 79-82, 1 P.3d 1148 (2000); Albertson v. State, 191 Wn. App. 284, 299-01, 361 P.3d 808 (2015). This statutory duty does not give rise to a general tort claim for negligent investigation. M.W. v. Dep't of Soc. & Health Servs., 149 Wn.2d 589, 601, 70 P.3d 954 (2003). Rather, the statute supports a claim for negligent investigation only when DSHS conducts a biased, incomplete, or flawed investigation that results in a harmful placement decision, such as failing to remove a child from an abusive foster home. McCarthy v. County of Clark, 193 Wn. App. 314, 328, 376 P.3d 1127 (2016); Lewis v. Whatcom County, 136 Wn. App. 450, 455-56, 459, 149 P.3d 686 (2006); M.W., 149 Wn.2d at 601-02. DSHS' statutory duty to investigate is not invoked until it receives a report of previous or ongoing conduct indicating abuse or neglect that is the subject of the alleged negligent investigation. See RCW 26.44.050(1); Wrigley v. State, 195 Wn.2d 65, 74-78, 455 P.3d 1138 (2020); M.E. v. City of Tacoma, 15 Wn. App. 2d 21, 35, 471 P.3d 950 (2020); Lewis, 136 Wn. App. at 460. Additionally, "[t]o prevail, the claimant must prove that the allegedly faulty investigation was the proximate cause of the harmful placement." Petcu v. State,

---

[8] The statute states in relevant part:
Except as provided in RCW 26.44.030(12), upon the receipt of a report alleging that abuse or neglect has occurred, the law enforcement agency or the department [of children, youth, and families] must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.
RCW 26.44.050(1); see RCW 26.44.020(10).

121 Wn. App. 36, 56, 86 P.3d 1234 (2004).

Plaintiffs cite to their DSHS expert Barbara Stone's opinion that Price's report to Grant about physical abuse in the foster home "should have prompted a mandatory report to Child Protective Services and subsequent investigation," during which each foster child "should have been interviewed in a safe environment and specifically asked if they were being abused in any way." However, the plain language of RCW 26.44.050 requires DSHS to investigate potential abuse or neglect that is the subject of the report. In other words, DSHS' statutory duty is to investigate the allegations reported to it. See RCW 26.44.050(1); see also Tyner, 141 Wn.2d at 80 (describing DSHS' duty under RCW 26.44.050 as "the duty to investigate allegations once they have been reported"). While DSHS' internal practices and policies may provide evidence of its standard of care in respect to the question of fact as to whether it breached its duty to investigate a report of abuse or neglect, they cannot establish a duty as a matter of law. See Joyce v. Dep't of Corrs., 155 Wn.2d 306, 323-24, 119 P.3d 825 (2005).

In the instant case, there is no evidence that DSHS received a report of previous or ongoing sexual abuse of the plaintiffs that occurred while they were placed in Carter's foster home. Both Price and Harris testified that they never told any social worker about the sexual abuse that they suffered. Although the record shows Price told a "Mrs. Grant," whom she believed to be a social worker, and other social workers about the physical abuse occurring in the Carter foster home, she did not report the sexual abuse.[9] Because the plaintiffs did not establish that DSHS received a report of alleged sexual abuse against them, they failed to establish that DSHS' statutory duty to investigate under RCW

---

[9] Harris only testified to disclosing the sexual abuse to Price.

11

26.44.050 was triggered. Therefore, the trial court did not err by dismissing plaintiffs' negligent investigation claim on summary judgment.

*B. Common Law Duty*

Plaintiffs also contend the trial court erred by not finding the record established questions for the jury under DSHS' common law duty to protect foster children. We agree.

Generally, there is no common law duty to prevent a third party from intentionally harming another unless "'a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct.'" Niece v. Elmview Grp. Home, 131 Wn.2d 39, 43, 929 P.2d 420 (1997) (internal quotation marks omitted) (quoting Hutchins v. 1001 Fourth Ave. Assocs., 116 Wn.2d 217, 227, 802 P.2d 1360 (1991)). A special relationship and the accompanying duty to protect arises when (1) the defendant has a special relationship with the tortfeasor that imposes a duty to control that person's conduct or (2) the defendant has a special relationship with the victim that gives the victim a right to protection. H.B.H. v. State, 192 Wn.2d 154, 168-69, 429 P.3d 484 (2018). The special relationship duty requires reasonable care to protect the victim from the tortious acts of third parties. Id. at 169.

In H.B.H. v. State, the Washington State Supreme Court held that DSHS has a special relationship with foster children because it remains the child's legal custodian throughout the dependency. Id. at 174-75. Although DSHS contracts out its duty to foster parents for day-to-day care, such foster placements are involuntary for a foster child, "and the State alone controls the placement of the child, determines the child welfare services to be provided, and decides when the child will be removed from a foster home, placed with a new foster family, or returned to the family home." Id. at 174. "'[A]s custodian and

caretaker of foster children,' the State is required to 'provide conditions free of unreasonable risk of danger, harm, or pain, and must include adequate services to meet the basic needs of the child.'" Id. at 164 (quoting Braam v. State, 150 Wn.2d 689, 700, 81 P.3d 851 (2003)). The court held that DSHS' special relationship with foster children "supports recognition of a duty in tort to protect foster children from foreseeable harms at the hands of foster parents." Id. at 178.

The state Supreme Court held that in addition to DSHS' statutory duty under RCW 26.44.050, it also has a protective duty defined by the standards of reasonable care; "[i]n any situation involving a … special relationship, the general duty is simply to use reasonable care to protect the other person from the criminal or tortious acts of third parties." Id. at 176. Specifically, the H.B.H. court held that DSHS has "an ongoing [special relationship] duty to 'monitor placements of children' to 'assure the safety, well-being, and quality of care being provided is within the scope of the intent of the legislature.'" Id. at 175-76 (quoting RCW 74.13.031(6)). The court commented, "Indeed, any faith society places in the child welfare system depends on DSHS exercising due diligence and adequately monitoring foster home placements." Id. at 167 n.4.

Ultimately, the H.B.H. court held the record created questions for the jury as to whether DSHS breached its protective duty to foster children allegedly abused by their foster parents by failing to conduct statutorily-required monitoring visits to an extent that was unreasonable. Id. at 160, 171, 181-83. The court recognized that although "DSHS did not obtain any information concerning abuse during this [foster care] period … and the social workers in contact with the children reported that the children seemed happy in the … [foster parents'] home," Id. at 160, evidence showed the DSHS social worker failed to

conduct monitoring visits for one year. Id. at 182. The court cited RCW 74.13.031(6), which directs DSHS to visit foster children, children in in-home dependencies, and their caregivers on a monthly basis for private and individual face-to-face meetings with the children and their caregivers. Id. at 176. The court held "the Court of Appeals correctly identified evidence that showed DSHS breached its [common law protective] duty by failing 'to conduct required health and safety checks … either at all or with sufficient regularity' … and [thus] fell below the standard of reasonable care." Id. at 181.

In the instant case, DSHS had a special relationship to the plaintiffs as foster children so as to establish a protective duty under the common law. This duty, as the H.B.H. court made clear, is separate and distinct from DSHS' statutory duty to investigate reports of abuse and neglect under RCW 26.44.050. Analogous to the record in H.B.H., the plaintiffs in the present case produced evidence from which a jury could reasonably infer that DSHS breached its protective duty of reasonable care by failing to complete monthly monitoring visits. Starting in 1985 or 1986, plaintiffs stated they were sexually abused multiple times over multiple months and/or years. Plaintiffs' DSHS expert Stone stated that social workers were required to complete monthly monitoring visits with every foster child during the time period the plaintiffs reported they were abused while they were in foster care. Stone stated, "At each visit, the social worker is obligated to conduct an interview of each foster child, in private, and inquire about their safety."

Plaintiffs reported that a social worker "[r]arely, if ever," came to ask them about their health and safety. Price testified that although she could not say whether a social worker never came to the foster home, she did not "recall a social worker ever coming to the house and talking to us." Harris testified that "[a] social worker never came. I mean,

the only time I got a chance to tell a social worker–one time they did come, and I was trying to get it out to them." Harris also testified that "[t]he only time the caseworker came"—"a little after" he falsely told someone at school that he had sex with Rosemary— he "never got to talk to them about nothing." Neither Price or Harris knew that DSHS had a requirement to visit them monthly because "the social workers never did it."

The State argues that DSHS was not required to perform monthly monitoring visits because the plaintiffs' dependency guardianships were ostensibly established prior to the start of the sexual abuse. This argument fails for two reasons. First, as we recite above, the evidence viewed most favorably for the plaintiffs shows the sexual abuse started years before their guardianships were established.[10]

Second, even assuming there was no genuine dispute that the sexual abuse began after the establishment of the plaintiffs' guardianships, the State's argument fails for lack of factual support. The State asserts that plaintiffs were under a late form of dependency guardianship pursuant to former RCW 13.34.232 (1994). The State avers that under this dependency guardianship, DSHS was not required to conduct monthly monitoring visits because the court assumes supervision of the child and the State has limited supervisory involvement.

Former RCW 13.34.232(1)(a) (1994) states that a dependency guardianship order shall "[a]ppoint a person or agency to serve as dependency guardian for the limited purpose of assisting the court to supervise the dependency." Additionally, the order must

---

[10] Specific to Harris, the State asserts "at most, the evidence is ambiguous about when Mr. Harris's guardianship began in relation to him meeting the Funks; according to his testimony, the two events overlapped." Because evidence shows that Bob's sexual abuse of Harris started while he was in foster care years before his guardianship was established in 1989, any other overlap there may have been between the sexual abuse and the eventual guardianship is immaterial to our review. See Haley, 25 Wn. App. 2d at 217 (citing Boyd, 197 Wn. App. at 142).

"[s]pecify the need for any continued involvement of the supervising agency and the nature of that involvement, if any." Former RCW 13.34.232(1)(e) (1994). The supervising agency may be DSHS. See former RCW 13.34.130(1)(b) (1994); In re A.W., 182 Wn.2d 689, 697-98, 344 P.3d 1186 (2015) (contrasting former dependency guardianship option with parental rights termination). The state Supreme Court in In re A.W., 182 Wn.2d at 700, 700 n.9, compared a dependency guardianship under former RCW 13.34.232 with a guardianship under the new statute, noting the latter dismisses the underlying dependency and terminates the provision of case management services by DSHS or the supervising agency. Compare RCW 13.36.050(5) with former RCW 13.34.232(4) (1994).

The State concedes in its response briefing that a court could require state involvement in a dependency guardianship. The State also does not argue that dependency guardianships under former RCW 13.34.232 categorically preclude a court from ordering DSHS to conduct monthly monitoring visits. Neither of the cases that the State cites stand for that principle. See In re Dependency of K.S.C., 137 Wn.2d 918, 928, 976 P.2d 113 (1999); Sheikh v. Choe, 156 Wn.2d 441, 445-46, 128 P.3d 574 (2006).

Plaintiffs' DSHS expert Stone opined that a court may terminate the obligation for DSHS to conduct monitoring visits in a guardianship order. But, Stone continued, "[w]ithout the Court orders in these cases, there is no way to conclude that the ongoing monitoring visits were not required after each guardianship was established." Although the State cites to evidence indicating Price was subject to a dependency guardianship as of May 10, 1988, there is nothing in the record to show what the court ordered in terms of DSHS or state involvement. See former RCW 13.34.232(1)(e) (1994). Additionally, nothing in the record shows the form of guardianship established for Harris. Accordingly,

we reject the State's factually unsupported and conclusory claim that DSHS was not required to regularly visit the plaintiffs to monitor their placement. We instead hold that DSHS' evidenced failure to conduct required monthly health and safety checks on the plaintiffs during their placement at the Carter foster home provides a basis from which a jury could determine that DSHS breached its protective duty of reasonable care. See H.B.H., 192 Wn.2d at 176, 181.

The State argues that plaintiffs did not present evidence to demonstrate proximate cause. The State avers that even if plaintiffs "could establish a duty to conduct health and safety visits, it is speculative to conclude that the lack of health and safety visits caused them to suffer abuse by the Funks." We disagree.

The court in H.B.H. rejected this very argument as a basis for summary judgment, holding that "crediting reasonable inferences [regarding causation] is the stuff of juries." Id. at 182. Like breach of duty, proximate cause is generally a question for the trier of fact. Hertog, 138 Wn.2d at 275. Proximate cause may be determined as a matter of law where reasonable minds could not differ. Id.; Meyers v. Ferndale Sch. Dist., 197 Wn.2d 281, 289, 481 P.3d 1084 (2021). Washington law recognizes that proximate cause consists of both cause in fact and legal causation. Hertog, 138 Wn.2d at 282; Hartley v. State, 103 Wn.2d 768, 777, 698 P.2d 77 (1985).

Cause in fact is based on a physical link between the act and the harm and requires that but for the conduct at issue, the harm would not have occurred. Est. of Shinaul M. v. Dep't of Soc. & Health Servs., 96 Wn. App. 765, 770, 980 P.2d 800 (1999); Hertog, 138 Wn.2d at 282-83; Hartley, 103 Wn.2d at 778.

Here, a reasonable jury could find from the evidence that but for DSHS' deficient

monitoring visits, the plaintiffs would have disclosed the Funks' sexual abuse and DSHS would have intervened to protect the plaintiffs from further abuse. See H.B.H., 192 Wn.2d at 181-82. The State's argument that such an inference would be unreasonable because Carter herself put an end to the Funks' babysitting is unpersuasive. We observe that it is unclear from the State's argument how Carter's involvement would shield DSHS from liability for the plaintiffs' suffered sexual abuse up until that point. Regardless, there can be more than one proximate cause to a plaintiff's harm. Doyle v. Nor-W. Pac. Co., 23 Wn. App. 1, 6, 594 P.2d 938 (1979); N.L. v. Bethel Sch. Dist., 186 Wn.2d 422, 437, 378 P.3d 162 (2016). It is up to the jury "to decide whether the conduct of subsequent actors broke the causal chain." H.B.H., 192 Wn.2d at 182.

Turning to the record, Stone opined that had DSHS conducted monitoring visits as required, a social worker would have engaged in private one-to-one in-person meetings with plaintiffs and directly asked them about their health and safety. Additionally, Stone opined that DSHS' failure to conduct regular monitoring visits "likely resulted in the missed opportunity to prevent" the Funks' ongoing sexual abuse of the plaintiffs.

Price testified she did not disclose the sexual abuse to Carter because Carter would not have believed her. Price, however, expressed that she went to a DSHS office several times to try to tell a social worker "about what was going on." Price indicated she did not report the sexual abuse because a social worker did not visit and speak with her, and she otherwise would have eventually disclosed the abuse if she received proper guidance. Harris testified he tried to report the sexual abuse to a social worker the "one time they did come." Harris otherwise told Price "all the time" about what was happening to him when they were children. Both Price and Harris stated that "if a social worker had

18

taken me aside and asked me privately if I was felt [sic] safe and/or was being abuse [sic], I would have disclosed the things that were occurring to me while placed in the Carter foster home."

Relative to cause in fact, legal causation is a more fluid concept and is grounded in policy and common-sense considerations as to how far the defendant's duty and thus liability for the consequences of the defendant's conduct should extend. Tyner, 141 Wn.2d at 82; Taggart v. State, 118 Wn.2d 195, 226, 822 P.2d 243 (1992). "[A] court should not conclude that the existence of a duty automatically satisfies the requirement of legal causation." Schooley v. Pinch's Deli Mkt., Inc., 134 Wn.2d 468, 479, 951 P.2d 749 (1998). "The focus in legal causation analysis is on 'whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability.'" Tyner, 141 Wn 2d at 82. While fundamental policy considerations related to the scope of a defendant's duty, such as foreseeability, are the starting points for the legal causation inquiry, the analysis also involves broader policy considerations. Meyers, 197 Wn.2d at 293. Asking the question, "'was the defendant under a duty to protect the plaintiff against the event which did in fact occur?'" "'serve[s] to direct attention to the policy issues which determine the extent of the original obligation and of its continuance, rather than to the mechanical sequence of events which goes to make up causation in fact.'" Schooley, 134 Wn.2d at 480 (quoting Hartley, 103 Wn.2d at 779-80). Beyond this, the legal cause inquiry allows a court for sound policy reasons to bar liability where the concepts of duty and foreseeability alone indicate a basis for liability, including "'mixed considerations of logic, common sense, justice, policy, and precedent.'" Id. at 479 (quoting King v. City of Seattle, 84 Wn.2d 239, 228, 525 P.2d 228 (1974) overruled on other

grounds by City of Seattle v. Blume, 134 Wn.2d 243, 259-60, 947 P.2d 223 (1997)).

Here, the State argues that the Funks' alleged sexual abuse of the plaintiffs exceeded the scope of foreseeability to make DSHS liable under its common law protective duty. The State specifically contends the matter is factually distinguishable from H.B.H. because Price and Harris were allegedly sexually abused by neighbors as opposed to suffering "foreseeable harms at the hands of foster parents." See 192 Wn.2d at 178. The State argues the neighbors' sexual abuse of the plaintiffs was too extraordinary and improbable to be foreseeable to DSHS.

In the context of a special relationship, a plaintiff's harm is foreseeable "if a reasonable person in the defendant's position would be aware of a 'general field of danger' posing a risk to one such as the plaintiff." Id. at 176-77 (quoting Niece, 131 Wn.2d at 50). "'Reasonable foreseeability does not require that the precise manner or sequence of events in which a plaintiff is harmed be foreseeable.'" Asphy, 31 Wn. App. 2d at 631 (quoting Albertson, 191 Wn. App. at 297). Rather, it "requires only that '[t]he hazard that brought about or assisted in bringing about the result must be among the hazards to be perceived reasonably, and with respect to which defendant's conduct was negligent.'" Id. (quoting Rikstad v. Holmberg, 76 Wn.2d 265, 268, 456 P.2d 355 (1969)). Conversely, a court may determine that a harm is legally unforeseeable, such as where a third party's intentional or criminal conduct "'is so highly extraordinary or improbable as to be wholly beyond the range of expectability.'" Id. (internal quotation marks omitted) (quoting Niece, 131 Wn.2d at 50).

In Niece, 131 Wn.2d at 44, the state Supreme Court recognized that various special relationships result in a duty to protect the vulnerable party from harms caused by

third parties' intentional or criminal conduct. Such third parties need not be limited to parties contracted with or delegated by the defendant to physically care for the vulnerable party. For example, in Shepard v. Mielke, 75 Wn. App. 201, 205-06, 877 P.2d 220 (1994), this court held that a nursing home had an ordinary duty of care[11] to protect its residents from criminal conduct by visitors. Shepard was sexually assaulted by the husband of another resident at the nursing facility. Id. at 203-04. Shepard required assistance to walk, had limited use of her hands, and experienced hallucinations and "'screaming fits.'" Id. at 203. When unable to calm Shepard, the nursing home staff closed the door to her room to prevent her from disturbing other residents. Id. The court held that because the function of a nursing home is to provide care for those who are unable to care for themselves as a result of physical or mental impairment, such impairment "'is a condition the known existence of which creates a duty to safeguard the plaintiff from the foreseeable consequences of its existence.'" Id. at 205 (quoting Hunt v. King County, 4 Wn. App. 14, 24, 481 P.2d 593 (1971)).

In its discussion of this court's decision in Shepard, the state Supreme Court in Niece quoted this court's observations that Shepard "'could not lock her door, screen visitors, or generally provide for her own safety.'" 131 Wn.2d at 45 (quoting Shepard, 75 Wn. App. at 205-06). Shepard "'was in … [the nursing home] precisely because she was unable to perform these tasks for herself.'" Id. (quoting Shepard, 75 Wn. App. at 205-06).

---

[11] Despite the parties' requests, the court in Shepard held that it was unnecessary to analyze the nursing home's duty under the special relationship framework to impose a duty on the nursing home to protect Shepard from the visitor's criminal act. 75 Wn. App. at 205. The court held that an ordinary duty of care was sufficient to analyze the nursing home's protective responsibility, and that the nursing home's "knowledge of the condition of its residents creates a concomitant duty much like that of a hospital to safeguard residents against reasonably foreseeable risks of harm." Id. at 205-06.

In its consideration of whether the visitor's sexually assaultive behavior was beyond the range of expectability, the Shepard court held that based on "the number of visitors who enter and leave nursing homes daily and the level of vulnerability found in many residents, it is not 'highly extraordinary' a resident shut away in a room by herself, whose screams are often ignored, could be victimized by a third party." 75 Wn. App. at 206.

Likewise, in its analysis of "the special relationship between a group home and its highly vulnerable residents," the state Supreme Court held in Niece that "[p]rofoundly disabled persons are totally unable to protect themselves and are thus completely dependent on their caregivers for their personal safety." 131 Wn.2d at 45-46. The court observed that Niece had physical and mental disabilities, including having "the mental abilities of a very young child." Id. at 42. An employee at Niece's group home sexually assaulted her multiple times. Id. The court held that the group home "was responsible for every aspect of" Niece's well-being. Id. at 50. "This responsibility gives rise to a duty to protect Niece and other similarly vulnerable residents from a universe of possible harms." Id. Thus, the group home had a duty to protect its developmentally disabled residents from "all foreseeable harms," regardless if caused by potential physical hazards, visitors, or staff. Id. at 47, 47 n.4; see Hunt, 4 Wn. App. at 20 (holding that hospital owed suicidal patient who was injured after jumping out of hospital window "duty to safeguard … from the reasonably foreseeable risk of self-inflicted harm through escape").

In its holding that the staff member's sexual abuse of Niece was not beyond the range of expectability, the state Supreme Court held that prior sexual assaults at the group home, an earlier policy against unsupervised contact with residents, Niece's expert opining against unsupervised contact, and our state's legislative recognition of the

problem of sexual abuse in residential care facilities "all demonstrate that sexual abuse by staff at a group home for developmentally disabled persons may be a foreseeable hazard against which reasonable precautions must be taken." Niece, 131 Wn.2d at 50-51. As a result, the foreseeability of the staff member's sexual abuse of Niece "remain[ed] a question of fact for the jury." Id. at 51 n.10. In a relationship based on a defendant's protective responsibilities to vulnerable persons in the defendant's custody, "[a] sexual assault is not legally unforeseeable 'as long as the possibility of sexual assaults … was within the general field of danger which should have been anticipated.'" N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter Day Saints, 175 Wn. App. 517, 530, 307 P.3d 730 (2013) (quoting Niece, 131 Wn.2d at 50)).

In N.K., 175 Wn. App. at 522, former scout N.K. sued a church, the Boy Scouts of America, and the local boy scouting council for their negligent failure to protect him from sexual abuse by a volunteer scout leader with a church-sponsored Boy Scout troop when he was 12 years old. Recognizing a special relationship duty, this court held that the church "was substituting for the parent when it had custody of" N.K. Id. at 534-35. In our consideration of foreseeability, we determined it was not necessary for the church to know about specific past incidents of child sexual abuse in scouting for the church to be aware of the general risk of sexual abuse of scouts. Id. at 531. We held:

> The general field of danger was that scouts would be sexually abused if a stranger newly arrived in town was permitted to supervise them one-on-one in isolated settings. Whether considered from the standpoint of negligence or proximate cause, such a risk cannot be described as so highly extraordinary or improbable as to compel deciding the issue of foreseeability as a matter of law.

Id. We determined it could be reasonably inferred that the church should have anticipated the danger of sexual abuse by an adult volunteer because the church had a rule of two-

adult supervision at scouting events. Id. at 532.

In N.K., we also analogized the protective custody of the church to that of when a school substitutes for a parent. Id. at 531; see Harris v. Fed. Way Pub. Sch., 21 Wn. App. 2d 144, 153, 505 P.3d 140 (2022) (describing special relationship between school and child). Our state Supreme Court, in McLeod v. Grant County Sch. Dist. No. 128, 42 Wn.2d 316, 319, 255 P.2d 360 (1953), held because a child is compelled to attend school, a school district and child do not enjoy a voluntary relationship. In McLeod, the court considered whether the school district should have anticipated the general field of danger wherein a young student was raped by older students in a dark unlocked room under the school bleachers. Id. at 321-22. The court held that "the general field of danger was that the darkened room under the bleachers might be utilized during periods of unsupervised play for acts of indecency between school boys and girls." Id. at 322. Because it was not highly extraordinary that the room was used for such acts, the Supreme Court left the question of whether the school district should have reasonably anticipated the room might be used for indecent acts to the jury. Id. at 323-24. We held in N.K. that the church-owned scouting cabin where N.K. testified the volunteer scout leader molested him as well as other opportunities that scouting provided for the volunteer scout leader to isolate his abuse victims were analogous to the darkened room under the bleachers where the sexual assault occurred in McLeod, 175 Wn. App. at 533; see also N.L., 186 Wn.2d at 425-26, 438 (holding that, regarding 18-year-old high school student's rape of a 14-year-old student that occurred off campus, it is foreseeable that a registered sex offender would commit sexual assault, "as is the fact that a much younger student can be convinced to leave campus by an older one").

In Peck v. Siau, 65 Wn. App. 285, 287-88, 827 P.2d 10018 (1992), this court considered a summary judgment appeal in regard to high school student Peck's claims against his school district and teacher for their negligent hiring, supervision, and retention of a librarian who had sexual contact with the student. The court affirmed summary judgment in favor of the district and teacher, focusing its analysis of the district's potential liability on the question of whether it had knowledge or should have known that the librarian was a risk to students. Id. at 289, 293-94. The state Supreme Court in Niece, however, held that cases like Peck, which focused on the scope of an employer's duty to control its employees for third parties' protection, is not helpful to inform the scope of a defendant's protective duty to a plaintiff based on the special relationship between the defendant and the plaintiff. 131 Wn.2d at 49. The Niece court observed the difference between the duty to control the conduct of another as opposed to protecting a victim placed under the defendant's care.[12] Id. at 49. The Niece court held:

> While an employer generally does not have a duty to guard against the possibility that one of its employees may be an undiscovered sexual predator, a group home for developmentally disabled persons has a duty to protect residents from such predators regardless of whether those predators are strangers, visitors, other residents, or employees.

Id. at 49. Similarly distinguishable, in Kok v. Tacoma Sch. Dist. No. 10, 179 Wn. App. 10, 14, 19, 317 P.3d 481 (2013), this court held it was not foreseeable to the school district that a high school student, Chanthabouly, suffering from paranoid schizophrenia would act violently toward another student. The estate of Kok sued the school district for negligence after Chanthabouly shot Kok in the school's hallway. Id. at 13. The court held the district

---

[12] In addition to a relationship between employer and employee, the Niece court noted that a duty to control another's actions is illustrated by the relationship between tavern keeper and intoxicated guest, physician and assistant, hospital and unqualified physician, and parent and child. 131 Wn.2d at 49 n.7.

did not have evidence through Chanthabouly's behavior or diagnosis that he would act violently toward another student. Id. at 23. Notably, the court commented that the estate's argument seemed to focus on the specific issue of whether the estate offered evidence to establish that the district should have known that Chanthabouly was dangerous. Id. at 18 n.5. The court thus did not conduct a foreseeability analysis based on the school's duty to protect Kok from a general field of danger while acting as a parental substitute.[13] See McLeod, 42 Wn.2d at 319-22; Meyers, 197 Wn.2d at 288-89.

In the instant case, the State argues the Funks' alleged sexual abuse of the plaintiffs was not within the general field of danger to be reasonably anticipated by DSHS. The State asserts that plaintiffs did not provide evidence to show that DSHS "or anyone else knew about the Funks' involvement in their lives" or that DSHS otherwise had cause for concern. But under a protective relationship analysis, the question is not whether DSHS had notice of the Funks' potential dangerousness. Rather, in regard to foreseeability, the inquiry is whether DSHS should have anticipated that the plaintiffs could generally be at risk of sexual abuse by substitute caregivers with access to them as a result of their unmonitored foster placement. See Niece, 131 Wn.2d at 49-51; see also Sanchez v. Aberdeen Sch. Dist. No. 5, 2023 WL 2682115, at *6 (W.D. Wash. Mar. 29, 2023) (court order) (distinguishing Kok decision from issue of whether it was foreseeable that a student would be sexually abused given school district's failure to train and supervise school employees regarding sexual abuse of students). "The duty to protect another person from the intentional or criminal actions of third parties arises where one

---

[13] In Kok, the court noted that although the estate asserted the trial court misinterpreted the scope of the district's duty, it did not provide argument as to why the scope was incorrect. 179 Wn. App at 18 n.5.

party is 'entrusted with the well being of another.'" Niece, 131 Wn.2d at 50 (quoting Lauritzen v. Lauritzen, 74 Wn. App. 432, 440, 874 P.2d 861 (1994)). Special relationships are "'based on the liable party's assumption of responsibility for the safety of another.'" R.N. v. Kiwanis Int'l, 19 Wn. App. 2d 389, 407, 496 P.3d 748 (2021) (internal quotation marks omitted) (quoting M.E., 15 Wn. App. 2d at 37)).

We also observe that Kok is distinguishable because it involves harm of a plaintiff by another vulnerable party subject to a defendant's protective duty. On this point, the Kok court relied its holding in part upon the district's duty to educate Chanthabouly, as a child with disabilities, in the general education environment "[t]o the maximum extent appropriate." 179 Wn. App at 21-23. The court held, "Although the Estate argues that his diagnosis alone should have alerted the District to the possibility of violent acts, this argument is not persuasive where the District is staffed by educators, not medical professionals, and where the District owed a duty to Chanthabouly to educate him with his peers." Id. at 23. The present case does not call for such balancing of DSHS' duty between the parties.

Additionally, the State argues that the Funks' alleged sexual abuse was not foreseeable to DSHS because there is no method through which DSHS could learn about a neighbor's interaction with a foster child or monitor neighbors like it does foster parents. Again, the State improperly places the focus on DSHS' anticipation of specifically who may harm a foster child, rather than its responsibility to safely place foster children, and to monitor to ensure foster children's continued safety in their placements. See H.B.H., 192 Wn.2d at 176-77, 181-83.

Like a child in the protective custody of a school district and church, or a profoundly

27

disabled resident in a group home, a child's dependence on their foster placement for safety is not voluntary. See id. at 174; Asphy, 31 Wn. App. 2d at 626. The state Supreme Court's holding in H.B.H. that DSHS has a duty "to protect foster children from foreseeable harms at the hands of foster parents," 192 Wn.2d at 178, is rooted in the foundational principle that "entrustment and vulnerability [of the victim], not physical custody, are at the heart of the special protective relationship." Id. at 172-73 (emphasis added). The victim's helplessness is a decisive factor in a custody-based special relationship. Id. at 172 (citing RESTATEMENT (SECOND) OF TORTS § 314A cmt. b).

Here, the general field of danger was the risk that foster children would be sexually abused while in foster care. Reasonable inferences drawn from the legal scope of DSHS' responsibilities specific to foster care placements and from evidence demonstrating the connection between the plaintiffs' placement and their alleged sexual abuse by the Funks demonstrate that this general field of danger was foreseeable.

Our state legislature has recognized that "[c]hildren placed in foster care are particularly vulnerable and have a special need for placement in an environment that is stable, safe, and nurturing." LAWS OF 1995, ch. 302, § 1; see also H.B.H., 192 Wn.2d at 180-81 (stating foster children "are particularly vulnerable and in need of protection"). Additionally, "the establishment of a dependency imposes essential rights and duties on the State to care for dependent children." H.B.H., 192 Wn.2d at 168. Foster children depend on DSHS to place them in reasonably safe settings, and to remove them from abusive placements. See Braam, 150 Wn.2d at 699-700; M.W., 149 Wn.2d at 602; Asphy, 31 Wn. App. 2d at 625. Whether a foster care placement is reasonably safe is not limited to the foster parent's own conduct toward the foster child, but necessarily includes abuse

28

the child is exposed to by virtue of being subject to the foster parent's decisions regarding the child's day-to-day care in their involuntary placement. See H.B.H., 192 Wn.2d at 167-68, 174; Sheikh, 156 Wn.2d at 454-55.

In such situations, although foster placements are intended to be temporary, a foster child is legally powerless to escape abusive foster settings without the State's oversight of the foster parent's exercise of their delegated parens patriae responsibilities. See H.B.H., 192 Wn.2d at 171, 174-75; RCW 74.13.300(1)(c), (3). Legislative findings supporting our state's mandatory reporting statute for child abuse state that "[g]overnmental authorities must give the prevention, treatment, and punishment of child abuse the highest priority, and all instances of child abuse must be reported to the proper authorities." RCW 26.44.030 (1985 ch. 259 § 1) (emphasis added); see also Bellotti v. Baird, 443 U.S. 622, 634, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979) (holding that children have special needs in respect to constitutionally protected rights including their "peculiar vulnerability," "inability to make critical decisions in an informed, mature manner," as well as "the importance of the parental role in child rearing").

Here, the evidence shows the plaintiffs were left vulnerable to the Funks' repeated sexual abuse as a result of the care they were receiving at their inadequately monitored foster home placement. Price testified that foster parent Carter designated Rosemary as the children's babysitter and that Rosemary sexually abused Price in her private downstairs room at the foster home when Carter was away. Price said that Carter wanted Rosemary "to always be over at our house to care for us." Price's testimony establishes that Rosemary only sexually abused her when they were in the foster home. Harris also testified the Funks would come over to the foster home "[w]henever" Carter needed a

babysitter for the foster children and, in addition to abusing him at the Funks' house, Bob sexually abused Harris when Bob came over to the foster home to babysit. Based on evidence showing the plaintiffs' helplessness in the face of DSHS' inadequate monitoring of their health and safety at their involuntary foster placement, we cannot say that plaintiffs' alleged sexual abuse by surrogate caregivers is so highly extraordinary or improbable to be wholly unexpected.

Furthermore, expert testimony from Stone, who specialized in child sexual abuse investigations, provides the reasonable inference that the purpose of DSHS' foster home monitoring was not merely to prevent sexual abuse by foster parents, but <u>any</u> abuse that foster children were left vulnerable to at their foster care placement. Although Stone discussed the investigation that should have ensued upon Price's report of physical abuse to a DSHS social worker, Stone testified that the resultant investigation should have consisted of investigators specifically asking the foster children "if they were being abused in <u>any way</u>." (Emphasis added.) Although the statute of limitations barred the plaintiffs' physical abuse claims, that does not necessarily prohibit this court or a jury, with proper jury instructions, from contemplating such facts in its consideration of the questions of breach of duty and proximate cause as to the plaintiffs' sexual abuse claims. <u>See</u> <u>Joyce</u>, 155 Wn.2d at 324; <u>Meyers</u>, 197 Wn.2d at 296. Stone opined if the plaintiffs or any other foster children disclosed "the abuse as described in the plaintiffs' depositions[,] …<u>all</u> the remaining foster children in the Carter foster home should have been permanently removed." (Emphasis added.) Stone's expert opinion that a subsequent investigation for potential removal of foster children from a placement would not be limited to abuse committed by a foster parent suggests that DSHS, through its monitoring of foster care

30

placements, should have reasonably anticipated the risk of a foster child's abuse by any party who had isolated access to the foster child by virtue of the child's involuntary placement. See Asphy, 31 Wn. App. 2d at 626; H.B.H., 192 Wn.2d at 174; McLeod, 42 Wn.2d at 319, 323-24.

We decline to hold that the Funks' alleged sexual abuse of the plaintiffs during their placement at the Carter foster home was legally unforeseeable as a matter of law under the facts presented here. Our state legislature's recognition of the need to prevent all abuse of children and of the unique vulnerability of foster children is most logically served by holding DSHS liable for its duty to protect foster children who are involuntarily dependent on its custodial care for their welfare and safety. We therefore conclude that questions of fact as to whether DSHS breached its protective duty to proximately cause the plaintiffs' harm should be left for a jury to decide.

CONCLUSION

Because the plaintiffs admittedly never reported the sexual abuse they endured while in foster care, they did not present facts supporting their claim that DSHS violated its statutory duty to investigate under RCW 26.44.050. To this extent, we affirm the trial court's summary judgment order in favor of the State. However, in addition to its statutory duty to investigate, DSHS owes a separate and distinct common law duty to protect foster children that is rooted in the special relationship it maintains with such vulnerable children in its custodial care. H.B.H., 192 Wn.2d at 175-76, 183. Entrustment for the safety and wellbeing of the vulnerable victim is the foundation of DSHS' special relationship with foster children. Id. at 173, 175-76. We hold that questions of fact remain as to whether DSHS breached its common law protective duty and whether it proximately caused the

31

plaintiffs' harm. Therefore, we affirm in part, reverse in part, and remand for further proceedings as to plaintiffs' common law sexual abuse claims against DSHS.

_Coburn, J._

WE CONCUR:

_Díaz, J._

_Dwyer, J._